# EXHIBIT A

LOAN AND SECURITY AGREEMENT


DRYDEN ADVISORY GROUP, LLC

and

Such other Persons joined hereto as Borrowers from time to time,

as Borrowers


with


BENEFICIAL MUTUAL SAVINGS BANK

as Lender

{00293356;v2}

## TABLE OF CONTENTS

PAGE

| | | |
|---|---|---|
| SECTION 1. | DEFINITIONS AND INTERPRETATION | 4 |
| 1.1 | Terms Defined | 8 |
| 1.2 | Matters of Construction | 8 |
| 1.3 | Accounting Principles: | 8 |
| 1.4 | Fiscal Quarters: | 8 |
| 1.5 | UCC Definitions | 8 |
| SECTION 2. | THE LOANS | 8 |
| 2.1 | Credit Facility - Description: | 8 |
| 2.2 | Revolving Credit Loans Funding Procedures: | 9 |
| 2.3 | Interest and Fees: | 9 |
| 2.4 | Additional Interest Provisions: | 9 |
| 2.5 | Payments: | 10 |
| 2.6 | Designated Deposit Account:. | 10 |
| 2.7 | Right of Setoff. | 10 |
| 2.8 | Use of Proceeds | 10 |
| 2.9 | Thirty-Day Pay Down | 11 |
| SECTION 3. | COLLATERAL | 11 |
| 3.1 | Description | 11 |
| 3.2 | Other Actions | 12 |
| 3.3 | Power of Attorney | 12 |
| 3.4 | Guarantees | 13 |
| SECTION 4. | CLOSING AND CONDITIONS PRECEDENT TO ADVANCES | 13 |
| 4.1 | Loan Documents, Resolutions and Other Documents: | 13 |
| 4.2 | Additional Preconditions to Loans | 13 |
| 4.3 | Absence of Certain Events: | 13 |
| 4.4 | Compliance with this Agreement: | 13 |
| 4.5 | Closing | 14 |
| 4.6 | Non-Waiver of Rights. | 14 |
| SECTION 5. | REPRESENTATIONS AND WARRANTIES | 14 |
| 5.1 | Organization and Validity: | 14 |
| 5.2 | Places of Business | 15 |
| 5.3 | Pending Litigation | 15 |
| 5.4 | Title to Collateral: | 15 |
| 5.5 | Governmental Consent: | 15 |
| 5.6 | Taxes: | 15 |
| 5.7 | Full Disclosure: | 15 |
| 5.8 | Guarantees, Contracts, etc.: | 15 |
| 5.9 | Compliance with Laws: | 15 |
| 5.10 | Other Associations | 16 |
| 5.11 | Environmental Matters: | 16 |
| 5.12 | Borrowing Base Reports | 16 |
| 5.13 | Security Interest | 16 |
| 5.14 | Accounts: | 16 |

{00293356;v2}

|       |                                                              |    |
|-------|--------------------------------------------------------------|----|
| 5.15  | Pension Plans                                                 | 16 |
| 5.16  | Representations and Warranties for each Loan                  | 16 |
| 5.17  | Commercial Tort Claims                                        | 18 |
| 5.18  | Letter of Credit Rights                                       | 18 |
| 5.19  | Intellectual Property:                                        | 18 |
| 5.20  | Solvency                                                      | 18 |
| 5.21  | Subordinated Debt                                             | 18 |
| SECTION 6. | BORROWER'S AFFIRMATIVE COVENANTS                         | 18 |
| 6.1   | Payment of Taxes and Claims                                   | 18 |
| 6.2   | Maintenance of Insurance, Financial Records and Existence:    | 19 |
| 6.3   | Business Conducted                                            | 19 |
| 6.4   | Litigation                                                    | 19 |
| 6.5   | Taxes                                                         | 19 |
| 6.6   | Financial Covenants:                                          | 19 |
| 6.7   | Financial and Business Information                            | 19 |
| 6.8   | Inspection                                                    | 20 |
| 6.9   | Material Adverse Developments:                                | 20 |
| 6.10  | Places of Business:                                           | 21 |
| 6.11  | Notice of Action:                                             | 21 |
| 6.12  | Commercial Tort Claim                                         | 21 |
| 6.13  | Primary Bank Accounts                                         | 21 |
| 6.14  | Eligible Accounts                                             | 21 |
| SECTION 7. | BORROWERS' NEGATIVE COVENANTS                            | 21 |
| 7.1   | Merger, Consolidation, Dissolution or Liquidation:           | 21 |
| 7.2   | Liens and Encumbrances                                        | 21 |
| 7.3   | Negative Pledge:                                              | 21 |
| 7.4   | Transactions With Subsidiaries:                              | 21 |
| 7.5   | Guarantees                                                    | 22 |
| 7.6   | Indebtedness:                                                 | 22 |
| 7.7   | Loans to Other Persons                                        | 22 |
| 7.8   | Change in Ownership/Management                                | 22 |
| 7.9   | Distributions:                                                | 22 |
| 7.10  | Subordinated Debt                                             | 23 |
| SECTION 8. | DEFAULT                                                 | 22 |
| 8.1   | Events of Default                                            | 22 |
| 8.2   | Cure:                                                        | 24 |
| 8.3   | Rights and Remedies on Default:                             | 24 |
| 8.4   | Nature of Remedies:                                          | 25 |
| 8.5   | Set-Off:                                                      | 25 |
| SECTION 9. | MISCELLANEOUS                                            | 25 |
| 9.1   | GOVERNING LAW:                                               | 25 |
| 9.2   | Integrated Agreement:                                        | 26 |
| 9.3   | Waiver and Indemnity:                                        | 26 |
| 9.4   | Time                                                        | 26 |
| 9.5   | Expenses of Lender:                                          | 26 |
| 9.6   | Confidentiality:                                            | 26 |

2

{00293356;v2}

| 9.7 | Notices: | 27 |
| 9.8 | Brokerage: | 27 |
| 9.9 | Headings | 27 |
| 9.10 | Survival | 27 |
| 9.11 | Successors and Assigns | 27 |
| 9.12 | Duplicate Originals: | 27 |
| 9.13 | Modification | 27 |
| 9.14 | Signatories: | 27 |
| 9.15 | Third Parties: | 28 |
| 9.16 | Waivers: | 28 |
| 9.17 | CONSENT TO JURISDICTION | 28 |
| 9.18 | WAIVER OF JURY TRIAL: | 28 |
| 9.19 | Publication: | 29 |
| 9.20 | Discharge of Taxes, Borrower's Obligations, Etc.: | 29 |

{00293356;v2}

Case 1:15-bk-00545-MDF    Doc 43-1    Filed 03/02/15    Entered 03/02/15 11:44:29    Desc
Exhibit    Page 5 of 63

## LOAN AND SECURITY AGREEMENT

This Loan and Security Agreement ("**Agreement**") is dated this 25ᵗʰ day of July, 2011, by and between Dryden Advisory Group, LLC, a Pennsylvania limited liability company, and such other Persons joined hereto as a Borrower from time to time (collectively, "**Borrowers**" and each individually a "**Borrower**") and Beneficial Mutual Savings Bank, as lender ("**Lender**").

### BACKGROUND

A.     Borrowers have requested that Lender make available to them, on a joint and several basis, a credit facility in the maximum amount of $300,000.00 which will be secured by a first priority perfected security interest in the Accounts and a second priority perfected security interest in other Collateral of Borrowers. Lender, as described herein, is willing to make the Credit Facility available to Borrowers pursuant to the terms and provisions hereinafter set forth.

B.     The parties desire to set forth the terms and conditions of their relationship to writing.

NOW, THEREFORE, the parties hereto, intending to be legally bound, hereby agree as follows:

## SECTION 1. DEFINITIONS AND INTERPRETATION

1.1     Terms Defined: As used in this Agreement, the following terms have the following respective meanings:

"**Account(s)**" has the meaning set forth in the UCC, and shall also include without limitation (a) all accounts, payment intangibles, instruments, chattel paper and all other rights of Borrowers to receive payments including without limitation, all rights to reimbursement under any agreements with an Obligor, (b) all accounts, general intangibles, rights, remedies, guarantees, supporting obligations, letter of credit rights, and security interests in respect of the foregoing and, all rights of enforcement and collection, all books and records evidencing or related to the foregoing, and all rights under this Agreement in respect of the foregoing, (c) all information and data compiled or derived by such Borrower in respect of such accounts receivable (other than any such information and data subject to legal restrictions of patient confidentiality), and (d) all proceeds of any of the foregoing.

"**Advance(s)**" means the principal amount of any monies advanced or credit extended, including without limitation the Revolving Credit Loans to or for the benefit of Borrowers, or any of them by Lender, under the Revolving Credit Note.

"**Advance Rate**" means with respect to Eligible Accounts 70% or such other percentage(s), as determined by Lender.

"**Affiliate**" means with respect to any Person (the "**Specified Person**"), (a) any Person which directly or indirectly controls, or is controlled by, or is under common control with, the Specified Person, and (b) any partner, director or officer (or, in the case of a Person which is not a corporation, any individual having analogous powers) of the Specified Person or of a Person who is an Affiliate of the Specified Person within the meaning of the preceding clause (a). For purposes of the preceding sentence, "control" of a Person shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, or direct or indirect ownership (beneficially or of record) of, or direct or indirect power to vote, 5% or more of the outstanding shares of any class of capital stock of such Person (or in the case of a Person that is not a corporation, 5% or more of any class of partnership or other equity interest).

"**Authorized Officer**" means any officer, member or partner of a Borrower authorized by specific resolution of such Borrower to request Loans as set forth in the incumbency certificate referred to in Section 4.1(c) of this Agreement.

4

{00293356;v2}

"Billing Date" means the billing date for billing the respective Obligor.

"Borrowing Base" means, at any date, an amount equal to the lesser of (a) the Revolving Loan Commitment, or (b) the product of (i) the Advance Rate, times (ii) the aggregate amount of all Eligible Accounts, as of such date.

"Borrowing Base Deficiency" means, as of any date, the amount, if any, by which (a) the aggregate amount of all Advances outstanding as of such date exceeds (b) the Borrowing Base as of such date.

"Borrowing Base Excess" means, as of any date, the amount, if any, by which (a) the Borrowing Base as of such date exceeds (b) the aggregate amount of all Advances outstanding as of such date.

"Borrowing Base Report" has the meaning set forth in Section 2.2(b) hereof.

"Business Day" means any day other than a Saturday, Sunday or any day on which banking institutions in Pennsylvania are permitted or required by law, executive order or governmental decree to remain closed or a day on which Lender is closed for business.

"Closing" has the meaning set forth in Section 4.5 hereof.

"Closing Date" has the meaning set forth in Section 4.5 hereof.

"Collateral" has the meaning set forth in Section 3.1 hereof.

"Collections" means with respect to any Account, all cash collections on such Account.

"Commitment Fee" has the meaning set forth in Section 2.3 hereof.

"Contract" means an agreement by which an Obligor is obligated to pay for services rendered to Persons receiving services of Borrowers.

"Credit Facility" has the meaning set forth in Section 2.1(a) hereof.

"Debt Service Coverage Ratio" means the ratio of (a) the sum of (i) net income, plus (ii) interest expense, plus (iii) depreciation and amortization expenses, minus Distributions to (b) the sum of (i) interest expense, plus (ii) the current portion of long-term Indebtedness, plus (iii) the current portion of lease payments under capitalized leases, all as determined for Borrowers on a consolidated basis, in accordance with GAAP consistently applied.

"Default Rate" means 300 basis points above the interest rate otherwise applicable on the Loans.

"Defaulted Account" means an Account as to which (a) has not been received in full within 90 days of the Billing Date, or (b) Lender reasonably deems uncollectible because of the bankruptcy or insolvency of the Obligor or any other reason.

"Designated Deposit Account" has the meaning set forth in Section 2.6.

"Distribution" means (a) dividends or other distributions on capital stock or partnership or other equity interests of a Borrower; (b) the redemption, repurchase or acquisition of such stock or partnership or other equity interests or of warrants, rights or other options to purchase such stock or partnership or other equity interest; and (c) loans made to any Shareholders, officers, directors and/or Affiliates of such Borrower.

"Eligible Account" means an Account of a Borrower:

5

{00293356;v2}

(a)     which is a liability of an Obligor subject to a valid and binding Contract with a Borrower,

(b)     the Obligor of which is not an Affiliate of a Borrower,

(c)     which is not outstanding more than 90 days past the Billing Date,

(d)     the Obligor on which does not have ten percent (10%) or more of its Accounts owing to Borrowers constituting Defaulted Accounts,

(e)     to the extent such Account does not include late charges or finance charges,

(f)     originating from within the United States of America, and

(g)     which complies with such other criteria and requirements as may be specified from time to time by Lender in its reasonable discretion.

"Event of Default" has the meaning set forth in Section 8.1 hereof.

"Expenses" has the meaning set forth in Section 9.5(a) hereof.

"GAAP" means generally accepted accounting principles, consistently applied.

"Guarantor" means, collectively, Ridson, LP, Kevjohn, Inc., John Ridley and Nora Ridley.

"Guarantee(s)" means the guaranty agreements executed by each Guarantor in favor of Lender.

"Hazardous Substances" means any substances defined or designated as hazardous or toxic waste, hazardous or toxic material, hazardous or toxic substance or similar term, by any environmental statute, rule or regulation of any governmental entity presently in effect and applicable to such real property.

"Indebtedness" of a Person at a particular date shall mean all liabilities and obligations of such Person, including without limitation, those which in accordance with GAAP would be classified upon a balance sheet as liabilities and all other indebtedness, debt and other similar monetary obligations of such Person whether direct or guaranteed, contingent or liquidated, matured or unmatured and all premiums, if any, due at the required prepayment dates of such any indebtedness, and  all indebtedness secured by a lien on assets owned by such Person, whether or not such indebtedness actually shall have been created, assumed or incurred by such Person.  Any indebtedness of such Person resulting from the acquisition by such Person of any assets subject to any lien shall be deemed, for the purposes hereof, to be the equivalent of the creation, assumption and incurring of the indebtedness secured thereby, whether or not actually so created, assumed or incurred.

"Loan(s)" has the meaning set forth in Section 2.1(a) hereof.

"Loan Documents" means this Agreement, the Revolving Credit Note, Guarantees, all financing statements and any other agreements, instruments, documents and certificates delivered in connection with this Agreement.

"Maturity Date" has the meaning set forth in Section 2.1(b) hereof.

"Note" means the Revolving Credit Note.

"Obligations" means all now existing or hereafter arising debts, obligations, covenants, and duties of payment or performance of every kind, matured or unmatured, direct or contingent, owing, arising, due, or payable to

6

Lender, by or from Borrowers, or any of them, whether arising out of this Agreement or any other Loan Document or otherwise, including, without limitation, all obligations to repay principal of and interest on all the Loans, and to pay interest, fees, costs, charges, expenses, professional fees, and all sums chargeable to Borrowers, or any of them, under the Loan Documents, whether or not evidenced by any note or other instrument.

"**Obligor**" means the party primarily obligated to pay an Account.

"**Permitted Liens**":

(a) liens existing on the Closing Date, disclosed to the Lender and to which the Lender has consented;

(b) liens for taxes, fees, assessments or other government charges or levies, either not delinquent or being contested in good faith and for which a Borrower maintains adequate reserves, acceptable to Lender in its sole discretion;

(c) purchase money liens acceptable to Lender in its sole discretion;

(d) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security or social welfare legislation; and

(e) Liens in favor of the Lender.

"**Person**" means any individual, corporation, partnership, limited liability partnership, limited liability company, association, trust, unincorporated organization, joint venture, court or government or political subdivision or agency thereof, or other entity.

"**Prime Rate**" means the highest per annum rate of interest referenced as the "Prime Rate" as reported in the Money Rates Section of The Wall Street Journal, on the date of determination. If The Wall Street Journal is not published on such Business Day or does not report such rate, such rate shall be as reported by such other publication or source as the Lender may select.

"**Property**" means an interest of Borrowers, or any of them, in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"**Revolving Credit Loan(s)**" has the meaning set forth in section 2.1(a)

"**Revolving Credit Note**" has the meaning set forth in Section 2.1(b).

"**Revolving Loan Commitment**" means an amount equal to Three Hundred Thousand Dollars ($300,000.00).

"**Shareholder**" means, as applicable, a shareholder, member or partner of Borrower.

"**Subordinated Debt**" shall mean indebtedness due and owing by Borrower to any Person (whether such indebtedness shall be now existing or hereinafter arising) which is permitted to exist pursuant to this Agreement and is subordinated to the Liabilities, all as evidenced by the agreements, documents and instruments attached to any Subordination Agreement.

"**Subordination Agreement**" shall mean individually and "Subordination Agreements" shall mean collectively, each agreement given to the Lender from time to time by any Person with respect to the Subordinated Debt, all in the form and manner satisfactory to Lender.

7

{00293356;v2}

"**Termination Date**" has the meaning set forth in Section 2.1(b).

"**Uniform Commercial Code**" or "**UCC**" means the Uniform Commercial Code as in effect from time to time in the Commonwealth of Pennsylvania.

"**Unmatured Event of Default**" means an event which with the passage of time, giving of notice or both, would become an Event of Default.

    1.2    <u>Matters of Construction</u>: The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision. Any pronoun used shall be deemed to cover all genders. Wherever appropriate in the context, terms used herein in the singular also include the plural and vice versa. All references to statutes and related regulations shall include any amendments of same and any successor statutes and regulations. Unless otherwise provided, all references to any instruments or agreements to which Lender and/or, where applicable, a Borrower, is a party, including, without limitation, references to any of the Loan Documents, shall include any and all modifications or amendments thereto and any and all extensions or renewals thereof.

    1.3    <u>Accounting Principles</u>: Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, this shall be done in accordance with GAAP, to the extent applicable, except as otherwise expressly provided in this Agreement.

    1.4    <u>Fiscal Quarters</u>: For the purposes hereof, "fiscal quarter" shall mean each quarterly accounting period during any fiscal year; <u>provided</u> that, all references to the fiscal quarter ending March 31, June 30, September 30 or December 31 shall mean the first, second, third or fourth fiscal quarter of the applicable fiscal year, respectively, irrespective of the actual date on which such fiscal quarter may end.

    1.5    <u>UCC Definitions</u>. Terms not otherwise defined herein or the other Loan Documents, shall have the same respective meanings as are given to those terms in the UCC.

## SECTION 2. THE LOANS

    2.1    <u>Credit Facility - Description</u>:

    (a)    Subject to the terms and conditions of this Agreement, Lender hereby establishes for the joint and several benefit of Borrowers, a credit facility ("**Credit Facility**") which shall include Advances which may be extended by Lender to or for the benefit of Borrowers from time to time hereunder in the form of revolving credit loans ("**Revolving Credit Loans**" or "**Loans**"). The Obligations of Borrowers under the Loans and this Agreement are joint and several and shall at all times be absolute and unconditional.

    (b)    At Closing, Borrowers shall execute and deliver a promissory note to Lender in the principal amount of the Three Hundred Thousand Dollars ($300,000.00) (as may be amended, modified or replaced from time to time, the "**Revolving Credit Note**"). The Revolving Credit Note shall evidence Borrowers' joint and several, absolute and unconditional obligation to repay Lender for all Advances made by Lender under the Revolving Credit Note, with interest as herein and therein provided. The aggregate outstanding principal amount of all Advances, shall not at any time exceed the lesser of (i) the Borrowing Base or (ii) the Revolving Credit Commitment. In no event shall the initial principal amount of any Advance be less than $5,000. Subject to such limitation, the outstanding balance of all Advances may fluctuate from time to time, to be reduced by repayments made by Borrowers, to be increased by future Advances which may be made by Lender. If the aggregate outstanding amount of all Advances exceeds the Borrowing Base, Borrowers shall immediately repay such excess in full. Lender has the right at any time, and from time to time, in its reasonable discretion (but without any obligation) to set aside reasonable reserves against the Borrowing Base in such amounts as it may deem appropriate. The Revolving Credit Note is payable on demand, and if no demand is made, then the term of the Revolving Credit Note shall expire on July 25, 2012 ("**Termination Date**"). The Revolving Credit

{00293356;v2}

Loans shall be repaid on or before the earlier of the Termination Date or upon termination of the Credit Facility or termination of this Agreement ("**Maturity Date**").

2.2     Revolving Credit Loans Funding Procedures:

(a)     Subject to the terms and conditions of this Agreement and so long as no Event of Default or Unmatured Event of Default has occurred hereunder, Lender will make Revolving Credit Loans to Borrowers, upon Lender's receipt of prior written request not later than noon (Eastern Time) on any Business Day, which shall include: (i) the date of such borrowing and (ii) the amount of such borrowing. Requests received after noon (Eastern Time) shall be deemed received on the next Business Day; or if Lender permits in its sole discretion and absolute discretion, an oral request of the Borrower to the Lender of the amount and date of each proposed Advance; provided such oral request is confirmed promptly after the oral request to the Lender by written confirmation as provided herein. Notwithstanding the foregoing, the Lender's records of any Advances made pursuant to this Agreement shall in the absence of manifest error, be deemed correct and acceptable and binding upon the Obligors. Each Advance shall be in an amount equal to $5,000.00 or any whole multiplier thereof provided; however, that the outstanding principal balance under this Agreement and the Note shall not exceed at any time the Revolving Loan Commitment.

(b)     No later than the tenth (10th) day of each month Borrowers shall deliver to Lender a Borrowing Base Report, in the form attached hereto as **Exhibit A**, and a detailed aging account receivable report, in form and substance satisfactory to Lender.

2.3     Interest and Fees:

(a)     Each Revolving Credit Loan shall bear interest on the outstanding principal amount thereof from the date made until such Revolving Credit Loan is paid in full, at a rate per annum equal to the Prime Rate, plus two percent (2.00%); provided, that at no time shall the interest rate on the Revolving Credit Loans be less than 5.00% per annum. The interest rate on all amounts outstanding under the Revolving Credit Note shall be adjusted daily.

(b)     If any Event of Default shall occur and be continuing, the rate of interest applicable to the Revolving Credit Loans then outstanding shall be the Default Rate. The Default Rate shall apply from the date of the Event of Default until the date such Event of Default is waived, and interest accruing at the Default Rate shall be payable upon demand.

(c)     Borrower shall pay a Commitment Fee of one-half of one percent (0.50%) of the Revolving Loan Commitment at the Closing of the Revolving Credit Loan.

(d)     Borrower shall pay an Annual Renewal Fee of one-half of one percent (0.50%) of the Revolving Loan Commitment upon renewal of the Revolving Credit Loan.

2.4     Additional Interest Provisions:

(a)     Calculation of Interest: Interest on the Loans shall be based on a year of three hundred sixty (360) days and charged for the actual number of days elapsed.

(b)     Continuation of Interest Charges: All contractual rates of interest chargeable on outstanding Loans shall continue to accrue and be paid even after default, maturity, acceleration, termination of the Credit Facility, judgment, bankruptcy, insolvency proceedings of any kind or the happening of any event or occurrence similar or dissimilar.

(c)     Applicable Interest Limitations: In no contingency or event whatsoever shall the aggregate of all amounts deemed interest hereunder and charged or collected pursuant to the terms of this Agreement exceed the

9

{00293356;v2}

highest rate permissible under any law which a court of competent jurisdiction shall, in a final determination, deem applicable hereto. In the event that such court determines Lender has charged or received interest hereunder in excess of the highest applicable rate, Lender shall, in its sole discretion, apply and set off such excess interest received by Lender against other Obligations due or to become due and such rate shall automatically be reduced to the maximum rate permitted by such law.

2.5 <u>Payments</u>:

(a) All accrued interest on the outstanding aggregate principal amount of all Advances shall be due and payable on the first day of each month. The entire outstanding aggregate unpaid principal amount of all Advances, together with all unpaid accrued interest thereon and all outstanding fees and Expenses due by Borrowers to Lender, if any, shall be due and payable on the Maturity Date.

(b) If at any time the aggregate principal amount of all Advances outstanding exceeds the Borrowing Base then in effect, Borrowers shall immediately make such principal prepayments of the Revolving Credit Loans as is necessary to eliminate such excess.

(c) No damage, destruction or condemnation of the Collateral nor any application of insurance or condemnation proceeds to the payment of the Obligations shall postpone or reduce the amount of any of the current installments of principal or interest becoming due under the Note which shall continue to be made in accordance with the terms of the Note until the Obligations are paid in full.

(d) Borrowers may prepay the principal of the Loans, in part or full, at any time without penalty, premium or notice.

(e) All payments and prepayments shall be applied first to any unpaid interest and fees and thereafter to the principal of the Loans and to other amounts due Lender, in the order as determined by Lender, in its sole discretion. Except as otherwise provided herein, all payments of principal, interest, fees, or other amounts payable by Borrowers hereunder shall be remitted to Lender in immediately available funds not later than noon (Eastern Time) on the day due. Whenever any payment is stated as due on a day which is not a Business Day, the maturity of such payment shall be extended to the next succeeding Business Day and interest shall continue to accrue during such extension.

2.6 <u>Designated Deposit Account</u>: All proceeds of Accounts shall be deposited by Borrowers into a designated deposit account to be established at or around Closing ("**Designated Deposit Account**") held by Lender. Lender shall have a first priority perfected security interest in and to the Designated Deposit Account and all funds deposited therein and Borrowers shall have the right to offset Obligations against the funds so deposited, as set forth in Section 2.7.

2.7 <u>Right of Setoff</u>. In addition to all liens upon and rights of setoff against each Borrower's money, securities or other property given to the Lender by law, Lender shall have, with respect to each Borrower's obligations to Lender under this Agreement and to the extent permitted by law, a contractual possessory security interest in and a contractual right of setoff against, and each Borrower hereby grants Lender a security interest in, and hereby assigns, conveys, delivers, pledges and transfers to Lender, all of the Borrower's right, title and interest in and to, all of the Borrower's deposits, moneys, securities and other property now or hereafter in the possession of or on deposit with, or in transit to, Lender, whether held in a general or special account or deposit, whether held jointly with someone else, or whether held for safekeeping or otherwise, excluding, however, all IRA, Keogh, and trust accounts. Every such security interest and right of setoff may be exercised without demand upon or notice to such Borrower. Every such right of setoff shall be deemed to have been exercised immediately upon the occurrence of an Event of Default hereunder without any action of Lender, although Lender may enter such setoff on its books and records at a later time.

2.8 <u>Use of Proceeds</u>: The extensions of credit under and proceeds of the Credit Facility shall be used to refinance existing Indebtedness and for working capital.

10

{00293356;v2}

2.9    Thirty-Day Pay Down. During the term of the Revolving Credit Note, Borrower agrees to pay down the aggregate principal balance of the Advances to $0.00 for thirty (30) consecutive calendar days annually.

## SECTION 3. COLLATERAL

3.1    Description: To secure the payment, promptly when due, and the punctual performance, of all of the Obligations, each Borrower grants to Lender a security interest in all of its right, title and interest in and to the following personal property of such Borrower whether now owned or hereafter acquired, and wherever located (collectively, the "Collateral");

(i)    Accounts. A security interest in all Accounts now owned or existing as well as any and all that may hereafter arise or be acquired by Borrower, and all the proceeds and products thereof, including without limitation, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any which accounts, or other proceeds of any sale or other disposition of inventory, together with any property evidencing or relating to the Accounts (such as guaranties and credit insurance), any security for the Accounts, and all books and records relating thereto (including, but not limited to, computer-generated and/or computer-prepared information).

(ii)    General Intangibles. A security interest in all general intangibles and other personal property now owned or hereafter acquired by Borrower (including, without limitation, all payment intangibles and any personal property, causes of action, goodwill, tax refunds, licenses, franchises, trademarks, trade names, service marks, copyrights, customer lists, and patents, and all rights under license agreements for use of the same) other than goods, accounts, chattel paper, documents or instruments

(iii)    Instruments. A security interest in all of Borrower's Instruments (including, without limitation, all promissory notes and all certificated securities and all certificates of deposit) now owned or existing as well as hereafter acquired or arising instruments and documents.

(iv)    Inventory. A security interest in all of Borrower's inventory, including all goods, merchandise, raw materials, goods, goods in process, finished goods, parts, supplies and other tangible personal property, wheresoever located, now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts for service or used or consumed in Borrower's business, and all additions and accessions thereto, and all leases and contracts with respect thereto, and all documents of title evidencing, or representing any part thereof, and all products and proceeds thereof, whether in the possession of the Borrower, warehouseman, bailee, or any other person, and all goods and inventory returned, reclaimed or repossessed.

(v)    Equipment, Furniture, Fixtures and other Tangible Property. A security interest in all equipment, furniture, fixtures and other tangible property of every nature and description whatsoever (whether or not any of the foregoing are affixed to realty), now owned or hereafter acquired by Borrower, including all appurtenances and additions thereto, and substitutions therefor and replacement thereof, wheresoever located, including all tools, parts and accessories used in connection therewith, and the rights of the Borrower under any manufacturer's warranties relating to the foregoing.

(vi)    Chattel Paper. A security interest in all of Borrower's interest under chattel paper, lease agreements and other instruments or documents (whether tangible or electronic), whether now existing or owned by Borrower or hereafter arising or acquired by Borrower, evidencing both a debt and security interest in or lease of specific goods.

(vii)    Other. A security interest in all of Borrower's interest, now owned or hereafter acquired, in and to the Borrower's unbilled net revenues and non-accrued filed claims.

11

{00293356;v2}

as well as any accessions, additions and attachments thereto, and the proceeds and products thereof, including without limitation, all cash, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property (including, without limitation, whatever is received upon the use, lease, sale, exchange, collections, any other utilization, or any disposition of any of the foregoing property, whether cash or non-cash, all rental or lease payments, accounts, chattel paper, instruments, documents, contract rights, general intangibles, machinery, equipment, inventory, substitutions, additions, accessions, replacements, products, and renewals of, for, or to such property, and all insurance therefor).

3.2     Other Actions:

(a)     In addition to the foregoing, each Borrower shall do anything further that may be lawfully and reasonably required by Lender to perfect its security interests and to effectuate the intentions and objectives of this Agreement, including, but not limited to, the execution (if required) and delivery of continuation statements, amendments to financing statements, security agreements, contracts and any other documents required hereunder. At Lender's request, each Borrower shall also immediately deliver (with execution by such Borrower of all necessary documents or forms to reflect Lender's security interest therein) to Lender, all items for which Lender must or may receive possession to obtain a perfected security interest.

(b)     Lender is hereby authorized to file financing statements naming Borrower as debtor, in accordance with the Uniform Commercial Code, and if necessary, to the extent applicable, to otherwise file financing statements without Borrower's signature if permitted by law. Each Borrower hereby authorizes Lender to file all financing statements and amendments to financing statements describing the Collateral in any filing office as Lender, in its sole, discretion may determine, including financing statements describing the Collateral as "All Assets" or using similar language and containing language indicating that the acquisition by a third party of any right, title or interest in or to the Collateral without Lender's consent shall be a violation of Lender's rights. Borrowers agree to comply with the requirements of all federal and state laws and requests of Lender in order for Lender to have and maintain a valid and perfected first priority security interest in the Collateral including, without limitation, executing and causing any other Person to execute such documents as Lender may require to obtain Control (as defined in the UCC) over all deposit accounts, electronic chattel paper, letter-of-credit rights and investment property.

3.3     Power of Attorney: Each of the officers of Lender is hereby irrevocably made, constituted and appointed the true and lawful attorney for each Borrower (without requiring any of them to act as such) with full power of substitution to do the following (such power to be deemed coupled with an interest): (1) endorse the name of such Borrower upon any and all checks, drafts, money orders and other instruments for the payment of monies that are payable to such Borrower and constitute collections on the Collateral; (2) execute in the name of such Borrower any financing statements, schedules, assignments, instruments, documents and statements that such Borrower is obligated to give Lender hereunder or is necessary to perfect Lender's security interest or lien in the Collateral; (3) to verify validity, amount or any other matter relating to the Collateral by mail, telephone, telecopy or otherwise; and (4) do such other and further acts and deeds in the name of such Borrower that Lender may reasonably deem necessary or desirable to enforce its right with respect to any Collateral.

3.4     ' Guarantees: Borrower shall cause to be executed guaranty/surety agreements (collectively and individually referred to as "Guarantees") in the form and substance satisfactory to Lender, pursuant to which Guarantors shall absolutely and unconditionally subject to the terms of the Guarantees, guarantee, as surety, the Obligations of Borrowers to Lender.

12

{00293356;v2}

## SECTION 4. CLOSING AND CONDITIONS PRECEDENT TO ADVANCES

Closing under this Agreement and the making of each Loan are subject to the following conditions precedent (all documents to be in form and substance satisfactory to Lender and Lender's counsel):

4.1     Loan Documents, Resolutions, and Other Documents: Prior to the Closing, Borrowers shall have delivered to Lender the following:

(a)     this Agreement, the Revolving Credit Note, the Guarantees and each document and agreement required to be executed under any provision of this Agreement or any of the other Loan Documents;

(b)     certified copies of (i) resolutions of each Borrower's board of directors, or manager, as applicable authorizing the execution of this Agreement, the Revolving Credit Note, and each other document to which it is a party, required to be delivered by any Section hereof and (ii) each Borrower's Articles of Incorporation and Bylaws or certificate or organization and operating agreement (as applicable);

(c)     incumbency certificates identifying all Authorized Officers of each Borrower, with specimen signatures;

(d)     payment by Borrowers of all Expenses associated with the Credit Facility incurred to the Closing Date and the Commitment Fee;

(e)     Uniform Commercial Code, judgment, federal and state tax lien searches;

(f)     an initial Borrowing Base Report;

(g)     all other documents, information and reports required or requested to be executed and/or delivered by Borrowers under any provision of this Agreement or any of the Loan Documents.

4.2     Additional Preconditions to Loans: Lender's obligation to make the initial Revolving Credit Loan and each subsequent Revolving Credit Loan shall be subject to the satisfaction of each of the following conditions:

(a)     After giving effect to each such Revolving Credit Loan the aggregate principal amount of all Advances outstanding shall not exceed the Borrowing Base then in effect;

(b)     All representations and warranties of Borrowers shall be deemed reaffirmed as of the making of such Revolving Credit Loan and shall be true both before and after giving effect to such Revolving Credit Loan, and no Event of Default or Unmatured Event of Default shall have occurred and be continuing, Borrowers shall be in compliance with this Agreement and the other Loan Documents, and Borrowers shall have certified such matters to Lender.

(c)     Borrowers shall have taken such other actions, including the delivery of documents and opinions as Lender may reasonably request.

4.3     Absence of Certain Events: As of the Closing Date and prior to each Loan, no Event of Default or Unmatured Event of Default hereunder shall have occurred and be continuing.

4.4     Compliance with this Agreement: Borrowers shall have performed and complied with all agreements, covenants and conditions contained herein including, without limitation, the provisions of Sections 6 and 7 hereof, which are required to be performed or complied with by Borrowers before or at the Closing Date and as of the date of each Advance.

13

{00293356;v2}

4.5 <u>Closing</u>: Subject to the conditions of this Section 4, the Credit Facility shall be made available on the date ("Closing Date") this Agreement is executed and all of the conditions contained in Section 4.1 hereof are completed ("Closing").

4.6 <u>Non-Waiver of Rights</u>: By completing the Closing hereunder, or by making Advances hereunder, Lender does not thereby waive a breach of any warranty, representation or covenant made by Borrowers hereunder or under any agreement, document, or instrument delivered to Lender or otherwise referred to herein, and any claims and rights of Lender resulting from any breach or misrepresentation by Borrowers are specifically reserved by Lender.

## SECTION 5. REPRESENTATIONS AND WARRANTIES

To induce Lender to complete the Closing and make the Loans under the Credit Facility to Borrowers, Borrowers warrant and represent to Lender that:

5.1 <u>Organization and Validity</u>:

(a) Dryden Advisory Group, LLC is a duly organized limited liability company and validly existing under the laws of the Commonwealth of Pennsylvania, it is duly qualified, validly existing and, to the extent applicable, in good standing and has lawful power and authority to engage in the business it conducts in the state and each jurisdiction where the nature and extent of its business requires qualification, except where the failure to so qualify would not be reasonably expected to have a material adverse effect on such Borrower's business, financial condition, Property or prospects.

(b) Kevjohn, Inc. is a duly organized corporation and validly existing under the laws of the Commonwealth of Pennsylvania, it is duly qualified, validly existing and, to the extent applicable, in good standing and has lawful power and authority to engage in the business it conducts in the state and each jurisdiction where the nature and extent of its business requires qualification, except where the failure to so qualify would not be reasonably expected to have a material adverse effect on such Borrower's business, financial condition, Property or prospects.

(c) Ridson, LP is a duly organized limited partnership and validly existing under the laws of the Commonwealth of Pennsylvania, it is duly qualified, validly existing and, to the extent applicable, in good standing and has lawful power and authority to engage in the business it conducts in the state and each jurisdiction where the nature and extent of its business requires qualification, except where the failure to so qualify would not be reasonably expected to have a material adverse effect on such Borrower's business, financial condition, Property or prospects.

(d) The making and performance of this Agreement and related agreements, and each document required by any Section hereof will not violate any law, government rule or regulation, or the charter, minutes, partnership agreement, operating agreement or bylaw provisions of any Borrower or violate or result in a default (immediately or with the passage of time) under any contract, agreement or instrument to which any Borrower is a party, or by which a Borrower is bound. No Borrower is in violation of nor has knowingly caused any Person to violate any term of any agreement or instrument to which it or such Person is a party or by which it may be bound or of its charter, minutes, partnership agreement, operating agreement or bylaws, which violation could have a material adverse effect on any Borrower's business, financial condition, Property or prospects.

(e) Each Borrower has all requisite corporate or other power and authority to enter into and perform this Agreement and the other Loan Documents and to incur the obligations herein provided for, and has taken all proper and necessary corporate or other action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents.

(f) This Agreement, the Revolving Credit Note and the other Loan Documents required to be executed and delivered by any Borrower(s) hereunder, when delivered, will be valid and binding upon all Borrowers party thereto and enforceable in accordance with their respective terms.

14

{00293356;v2}

5.2    Places of Business:  Each Borrower's chief executive office and the only other places of business of each such Borrower are located at the corresponding addresses set forth on the signature page to this Agreement.  No Borrower has been organized in any other jurisdiction nor changed any such location in the last five years, (ii) no Borrower has changed its name in the last five years, and (iii) during such period no Borrower used, nor does any Borrower now use, any fictitious or trade name.

5.3    Pending Litigation:  There are no judgments or judicial or administrative orders, proceedings or investigations (civil or criminal) pending, or to the knowledge of any Borrower, threatened, against any Borrower in any court or before any governmental authority or arbitration board or tribunal, none of which, if adversely determined would have a material adverse effect on such Borrower.  No Borrower is in default with respect to any order of any court, governmental authority, regulatory agency or arbitration board or tribunal.  No Shareholder or executive officer of any Borrower has been indicted or convicted in connection with or is engaging in any criminal conduct, or is currently subject to any lawsuit or proceeding or under investigation in connection with any anti-racketeering or other conduct or activity.

5.4    Title to Collateral:  Each Borrower has good and marketable title to all the Collateral it respectively purports to own, free from liens, claims and encumbrances, except those of Lender and Permitted Liens.

5.5    Governmental Consent:  Neither the nature of any Borrower or of any Borrower's business or Property, nor any relationship between any Borrower and any other Person, nor any circumstance affecting any Borrower in connection with the execution, issuance and/or delivery of this Agreement or the Note is such as to require a consent, approval or authorization of, or filing, registration or qualification with, any governmental authority on the part of any such Borrower in connection with the execution and delivery of this Agreement or the issuance or delivery of the Note or other Loan Documents.

5.6    Taxes:  All tax returns required to be filed by Borrowers, or any of them, in any jurisdiction have in fact been filed, and all taxes, assessments, fees and other governmental charges upon Borrowers, or any of them, or upon any of their respective Property, income or franchises, which are shown to be due and payable on such returns have been paid, except for those taxes being contested in good faith with due diligence by appropriate proceedings and for which appropriate reserves have been maintained under GAAP.  No Borrower is aware of any proposed additional tax assessment or tax to be assessed against or applicable to any Borrower that could have a material adverse effect on such Borrower's business, financial condition, Property or prospects.

5.7    Full Disclosure:  Neither the financial statements previously delivered to Lender, nor this Agreement or related agreements and documents or any written statement furnished by any Borrower to Lender in connection with the negotiation of the Credit Facility and contained in any financial statements or documents relating to any Borrower contain any untrue statement of a material fact or omit a material fact necessary to make the statements contained therein or herein not misleading.

5.8    Guarantees, Contracts, etc.:

       (a)    No Borrower owns nor holds partnership interests or equity or long term debt investments in, has any outstanding advances to, or serves as guarantor, surety or accommodation maker for the obligations of, or has any outstanding borrowings from, any Person.

       (b)    No Borrower is a party to any contract or agreement, or subject to any charter or other entity restriction, which materially and adversely affects its business, financial condition, Property or prospects.

       (c)    Except as otherwise specifically provided in this Agreement, no Borrower has agreed or consented to cause or permit any of the Collateral whether now owned or hereafter acquired to be subject in the future (upon the happening of a contingency or otherwise) to a lien or encumbrance not permitted by this Agreement.

5.9    Compliance with Laws:

15

{00293356;v2}

(a)     No Borrower is in violation of, has received written notice that it is in violation of, or has knowingly caused any Person to violate, any applicable statute, regulation or ordinance of the United States of America, or of any state, city, town, municipality, county or of any other jurisdiction, or of any agency, or department thereof, (including without limitation, environmental laws and regulations), which could materially and adversely affect its business, financial condition, Property or prospects.

(b)     Each Borrower is current with all reports and documents required to be filed with any state or federal securities commission (if any) or similar agency and is in full compliance in all material respects with all applicable rules and regulations of such commissions.

5.10    <u>Other Associations</u>: No Borrower is engaged in nor has an interest in any joint venture or partnership with any other Person or has any Subsidiaries or Affiliates.

5.11    <u>Environmental Matters</u>: No Borrower has knowledge:

(a)     of the presence of any Hazardous Substances on any of the real property where any Borrower maintains operations or has its personal property in violation of any law governing the use, disposal or disposition of Hazardous Substances, or

(b)     of any on-site spills, releases, discharges, disposal or storage of Hazardous Substances that have occurred or are presently occurring on any of such real property where any Collateral is located, or

(c)     of any spills, releases, discharges or disposal of Hazardous Substances that have occurred, are presently occurring on any other real property as a result of the conduct, action or activities of any Borrower.

5.12    <u>Borrowing Base Reports</u>: Each Borrowing Base Report signed by Borrowers, on behalf of Borrowers, contains and will contain an accurate summary of all Eligible Accounts of Borrowers contained in the Borrowing Base as of its date.

5.13    <u>Security Interest</u>: Each Borrower has granted to Lender a valid security interest, and upon filing of the UCC Financing Statement in the appropriate recording office, a perfected first priority security interest in the Accounts and second priority security interest in the other Collateral, subject to no other liens, claims or encumbrances, other than Permitted Liens.

5.14    <u>Accounts</u>:

(a)     No Borrower has done nor shall do anything to interfere with the collection of the Accounts and no Borrower shall amend or waive the terms or conditions of any Account or any related Contract in any material adverse manner without Lender's prior written consent.

(b)     Each Borrower has made and will continue to make all payments to Obligors necessary to prevent any Obligor from offsetting any earlier overpayment to such Borrower against any amounts such Obligor owes on an Account.

5.15    <u>Pension Plans</u>: Each pension or profit sharing plan, if any, to which any Borrower is a party has been and will be funded in accordance with the obligations of such Borrower(s) set forth in such plan.

5.16    <u>Representations and Warranties for each Loan</u>:

16

{00293356;v2}

(a) Each Account reported to Lender as an Eligible Account shall, at all times when such Account is included in the Borrowing Base calculation, be in compliance with all of the following representations:

(i) Such Account satisfies each of the conditions of an Eligible Account.

(ii) All information relating to such Account that has been delivered to Lender is true and correct in all material respects. With respect to each such Account that has been billed, the corresponding Borrower has delivered to the Obligor all requested supporting claim documents and all information set forth in the bill and supporting claim documents is true, complete and correct in all material respects.

(iii) There is no lien or adverse claim in favor of any third party, nor any filing against any Borrower, as debtor, covering or purporting to cover any interest in such Account.

(iv) Such Account is (i) payable in the amount set forth on the Borrowing Base Report, and to Borrowers' knowledge is recognized as such by the Obligor, (ii) the legally enforceable obligation of such Obligor, and (iii) an account receivable or general intangible within the meaning of the UCC of the state in which the corresponding Borrower has its chief executive office, or is a right to payment under a Contract or policy of insurance or proceeds thereof, and is not evidenced by any instrument (other than invoices) or chattel paper. There is no payor other than the Obligor identified by Borrowers as the payor primarily liable on such Account.

(v) No such Account (i) requires the approval of any third person for such Account to be assigned to Lender hereunder, (ii) is subject to any legal action, proceeding or investigation (pending or threatened), dispute, set-off, counterclaim, defense, abatement, suspension, deferment, deductible, reduction or termination by the Obligor, or (iii) is past, or within 180 days of, the statutory limit for collection applicable to the Obligor.

(vi) Such Borrower does not have any guaranty of, letter of credit support for, or collateral security for, such Account, other than any such guaranty, letter of credit or collateral security as has been assigned to Lender.

(vii) The services constituting the basis of such Account, (i) at the time such services were rendered were fully covered by Contract obligating the applicable Obligor to make payment with respect to such Account (and the corresponding Borrower has verified such determination), and (ii) such services were rendered in the ordinary course of such Borrower's business.

(viii) The fees and charges charged for the services constituting the basis for such Account were when rendered and are currently consistent with (i) the usual, customary and reasonable fees charged by Borrowers or (ii) pursuant to negotiated fee contracts, or imposed fee schedules, with or by the applicable Obligors.

(ix) The Obligor with respect to such Account is located in the United States.

(x) The representations and warranties made by Borrowers in the Loan Documents and all financial or other information delivered to Lender with respect to Borrowers and such Account do not contain any untrue statement of material fact or omit to state a material fact necessary to make the statement made not misleading.

(xi) If requested by Lender, a copy of each related Contract to which each Borrower is a party has been delivered to Lender unless any such Borrower shall have certified in an Officer's

17

{00293356;v2}

Certificate that such delivery is prohibited by the terms of the Contract or by law, and the circumstances of such prohibition.

(xii)  Neither such Account nor the related Contract contravenes any laws, rules or regulations applicable thereto (including, without limitation, laws, rules and regulations relating to usury, consumer protection, truth-in-lending, fair credit billing, fair credit reporting, equal credit opportunity, fair debt collection practices and privacy) and no party to such related Contract is in violation of any such law, rule or regulation in connection with such Contract.

(xiii)  To the best of Borrowers' knowledge, no Obligor on such Account is bankrupt, insolvent, or is unable to make payment of its obligations when due, and no other fact exists which would cause any Borrower reasonably to expect that the amount billed to the related Obligor for such Account will not be paid in full when due.

(b)  Reserved.

5.17  Commercial Tort Claims:  Borrowers have no commercial tort claims against any third parties.

5.18  Letter of Credit Rights:  Borrowers have no letter of credit rights.

5.19  Intellectual Property:  Except as otherwise disclosed to Lender, (i) Borrowers do not require any copyrights, patents, trademarks or other intellectual property, or any license(s) to use any patents, trademarks or other intellectual property in order to provide services to their customers or to bill Obligors and collect therefrom, in the ordinary course of business, and (ii) Lender will not require any copyrights, patents, trademarks or other intellectual property or any licenses to use the same in order to provide such services or bill and collect the Accounts (other than shrink wrap licenses), after the occurrence of an Event of Default.

5.20  Solvency:  On the Closing Date, and immediately prior to and after giving effect to each borrowing hereunder and the use of the proceeds thereof, with respect to each Borrower (a) the fair value of its assets is greater than the amount of its liabilities (including disputed, contingent and unliquidated liabilities) as such value is established and liabilities evaluated, (b) the present fair saleable value of its assets is not less than the amount that will be required to pay the probable liability on its debts as they become absolute and matured, (c) it is able to realize upon its assets and pay its debts and other liabilities (including disputed, contingent and unliquidated liabilities) as they mature in the normal course of business, (d) it does not intend to, and does not believe that it will, incur debts or liabilities beyond its ability to pay as such debts and liabilities mature, and (e) it is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which its property would constitute unreasonably small capital.

5.21  Subordinated Debt:  The agreements, documents and instruments attached to the Subordination Agreements being executed and delivered contemporaneously with the execution of this Agreement are true and correct copies of all of the documentation evidencing the Subordinated Debt in existence as of the date of this Agreement and represent the complete agreement of Borrower to make payments with respect to the Subordinated Debt, and there have been no changes, modifications, alterations or amendments to such agreements, documents and instruments.

## SECTION 6. BORROWER'S AFFIRMATIVE COVENANTS

Each Borrower covenants that until all of Borrowers' Obligations to Lender are paid and satisfied in full and the Credit Facility has been terminated:

6.1  Payment of Taxes and Claims:  Each Borrower shall pay, before they become delinquent, all taxes, assessments and governmental charges or levies imposed upon it or upon such Borrower's Property, except for those being contested in good faith with due diligence by appropriate proceedings and for which appropriate reserves have been maintained under GAAP.

18

{00293356;v2}

6.2     Maintenance of Insurance, Financial Records and Existence:

(a)     Property Insurance - Borrowers shall maintain or cause to be maintained general liability and casualty insurance on its Property covering, inter alia, fire, flood, casualty and such other hazards in such amounts, with such deductibles and with such insurers as are customarily used by companies operating in the same industry as Borrowers  The policies of all such casualty insurance shall contain standard Lender Loss Payable, Mortgagee and additional insured clauses (as applicable) issued in favor of Lender pursuant to which all losses thereunder shall be paid to Lender as Lender's interests may appear.  Such policies shall expressly provide that the requisite insurance cannot be altered or canceled without thirty (30) days prior written notice to Lender and shall insure Lender notwithstanding the act or neglect of the insured.  At or prior to Closing, Borrowers shall furnish Lender with insurance certificates certified as true and correct and being in full force and effect as of the Closing Date or such other evidence of insurance as Lender may require.

(b)     Financial Records - Borrowers shall keep current and accurate books of records and accounts in which full and correct entries will be made of all of its business transactions, and will reflect in its financial statements adequate accruals and appropriations to reserves, all in accordance with GAAP.  No Borrower shall change its respective fiscal year end date without the prior written notice to Lender.

(c)     Existence and Rights - Each Borrower shall do (or cause to be done) all things necessary to preserve and keep in full force and effect its legal existence, good standing, rights and franchises.

(d)     Compliance with Laws - Each Borrower (i) shall be in compliance with any and all laws, ordinances, governmental rules and regulations, and court or administrative orders or decrees to which it is subject, whether federal, state or local (including without limitation all environmental or environmental-related laws, statutes, ordinances, rules, regulations and notices), and (ii) shall obtain and maintain any and all licenses, permits, franchises, certificates of need or other governmental authorizations necessary to the ownership of its Property or to the conduct of its businesses, except where a violation or failure to obtain would not reasonably be expected to materially adversely affect the business, Property, financial conditions or prospects of such Borrower, the Collateral, or Lender's rights with respect to the Collateral.

6.3     Business Conducted:  Each Borrower shall continue in the business presently operated by it using its best efforts to maintain its customers.  No Borrower shall engage, directly or indirectly, in any material respect in any line of business substantially different from the businesses conducted by it immediately prior to the Closing Date.

6.4     Litigation:  Borrowers shall give prompt notice to Lender of any litigation claiming in excess of $25,000.00 from Borrowers, or any of them, or which otherwise would reasonably be expected to have a material adverse effect on the business, financial condition, Property or prospects of Borrowers, or any of them.

6.5     Taxes:  Borrowers shall pay all taxes (other than taxes based upon or measured by Lender's income or revenues), if any, in connection with the Loans and/or the recording of any financing statements or other Loan Documents.  The Obligations of Borrowers under this section shall survive the payment of Borrowers' Obligations under this Agreement and the termination of this Agreement.

6.6     Financial Covenants:

(a)     Debt Service Coverage Ratio.  Borrowers shall maintain a Debt Service Coverage Ratio of at least 1.25:1:00 measured as of December 31, 2011, and measured as of the last day of each fiscal year thereafter.

6.7     Financial and Business Information:  Borrowers shall deliver to Lender the following (all to be in form and substance satisfactory to Lender):

19

{00293356;v2}

(a)    Financial Statements and Collateral Reports:

(i)    as soon as available but in any event, within one hundred twenty (120) days after the end of each fiscal year of Borrowers, deliver financial statements of Borrowers for such year which present fairly Borrowers' financial condition including the balance sheet of Borrowers as at the end of such fiscal year and a statement of cash flows and income statement for such fiscal year, all on a consolidated and consolidating basis, setting forth in the consolidated statements in comparative form, the corresponding figures as at the end of and for the previous fiscal year, all in reasonable detail, including all supporting schedules, and reviewed by independent public accountants of recognized standing, selected by Borrowers and reasonably satisfactory to Lender, and prepared in accordance with GAAP;

(ii)    as soon as available but in any event, within one hundred twenty (120) days after the end of each fiscal year of Borrowers, deliver financial statements for each Guarantor;

(iii)    as soon as available but in any event within forty-five (45) days after the end of each fiscal quarter, deliver to Lender, Borrowers' accountant prepared compiled quarterly consolidated and consolidating financial statements, along with year to date information, including a balance sheet, income statement and statement of cash flows with respect to the periods measured and prepared in accordance with GAAP;

(iv)    as soon as available but in any event, within fifteen days of filing, annual federal corporate tax returns of Borrowers and federal tax returns of each Guarantor, including any filed K-1 forms;

(v)    as soon as available but in any event, by February 1 of each year, Borrowers' annual budget; and

(vi)    such other data, reports, statements and information (financial or otherwise), as Lender may reasonably request.

(b)    Notice of Event of Default - promptly upon becoming aware of the existence of any condition or event which constitutes a default or an Event of Default or Unmatured Event of Default under this Agreement, a written notice specifying the nature and period of existence thereof and what action Borrowers are taking (and propose to take) with respect thereto;

(c)    Notice of Claimed Default - promptly upon receipt by any Borrower, notice of default, oral or written, given to such Borrower by any creditor for borrowed money in excess of $50,000.00.

6.8    Inspection: Provided no Event of Default has occurred and is continuing, on reasonable notice and no more than semi-annually, Borrowers will permit any of Lender's officers or other representatives to visit and inspect any Borrower's location(s) or where any Collateral is kept during regular business hours to examine and audit all of such Borrower's books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, employees and independent certified public accountants and attorneys. Borrowers shall pay to Lender all reasonable fees based on standard rates for such inspections.

6.9    Material Adverse Developments: Each Borrower agrees that immediately upon it or any of its officers becoming aware of any development or other information which would reasonably be expected to materially and adversely affect the businesses, financial condition, Property, prospects of a Borrower or a Borrower's ability to perform under this Agreement, it shall give to Lender telephonic or facsimile notice specifying the nature of such development or information and such anticipated effect. In addition, such verbal communication shall be confirmed by written notice thereof to Lender on the next Business Day after such verbal notice is given.

20

6.10    Places of Business:  Each Borrower shall give thirty (30) days prior written notice to Lender of any changes (a) in its jurisdiction of organization, (b) in the location of any of its chief executive office or any other places of business, or the establishment of any new, or the discontinuance of any existing place of business, and (c) in its name.

6.11    Notice of Action:  Each Borrower will promptly notify Lender in the event of any legal action, dispute, setoff, counterclaim, defense or reduction that is or may be asserted by an Obligor with respect to any Account that may have a material adverse effect on the collectability of such Account or all Accounts collectively.

6.12    Commercial Tort Claim:  Borrowers shall provide written notice to Lender of any commercial tort claim to which a Borrower is or becomes a party or which otherwise inures to the benefit of a Borrower.

6.13    Primary Bank Accounts:  Borrowers shall maintain all deposit accounts for the operation of the business with Lender so long as this Agreement is in full force and effect.

6.14    Eligible Accounts.  Promptly upon becoming aware thereof, notify Lender if any Account identified by such Borrower to Lender as an Eligible Account becomes ineligible for any reason.

## SECTION 7.  BORROWERS' NEGATIVE COVENANTS

Each Borrower covenants that until all of Borrowers' Obligations to Lender are paid and satisfied in full and the Credit Facility has been terminated, that:

7.1    Merger, Consolidation, Dissolution or Liquidation:

(a)    No Borrower shall sell, lease, license, transfer or otherwise dispose of its Property (other than the sale of inventory and disposition of obsolete equipment not to exceed the aggregate amount of $5,000 sold in the ordinary course or ordinary operation of such Borrower's business), without Lender's prior written consent, which shall not be unreasonably withheld.

(b)    No Borrower shall merge or consolidate with, or acquire, any other Person or commence a dissolution or liquidation, other than through a merger with another Borrower, without Lender's prior written consent.

7.2    Liens and Encumbrances:  No Borrower shall: (i) execute a negative pledge agreement with any Person covering any of the Collateral, or (ii) cause or permit or agree or consent to cause or permit in the future (upon the happening of a contingency or otherwise) the Collateral, whether now owned or hereafter acquired, to be subject to any lien, claim or encumbrance other than those of Lender and Permitted Liens.

7.3    Negative Pledge:  No Borrower shall permit a lien or security interest to exist on its common stock, partnership interests or membership units nor shall any such Borrower permit, pledge or grant a lien or security interest to exist on the common stock, partnership interests or membership units of its subsidiaries and/or Affiliates.

7.4    Transactions With Subsidiaries:

(a)    No Borrower shall enter into any transaction with any subsidiary (other than another Borrower) including, without limitation, the purchase, sale, lease or exchange of Property, or the loaning, capitalization or giving of funds to any subsidiary, unless (i) such subsidiary is engaged in a business substantially related to the business conducted by such Borrower and (ii) the transaction is in the ordinary course of and pursuant to the reasonable requirements of such Borrower's business and upon terms substantially the same and no less favorable to such Borrower as it would obtain in a comparable arm's-length transactions with any Person not a subsidiary and (iii) such transaction is not prohibited hereunder.

(b)    Subject in any event to the limitations of Section 7.4(a) above and except with the prior written consent of Lender, which consent shall not be unreasonably withheld, no Borrower shall create or acquire any

21

{00293356;v2}

subsidiary unless such subsidiary engages in a business substantially related to the business of such Borrower as conducted immediately prior to the Closing Date, and if required by Lender, such subsidiary becomes a Borrower hereunder.

7.5     Guarantees:  No Borrower shall become or be liable, directly or indirectly, primary or secondary, matured or contingent, in any manner, whether as guarantor, surety, accommodation maker, or otherwise, for the existing or future indebtedness of any kind of any other Person, except endorsements in the ordinary course of business of negotiable instruments for deposit or collection.

7.6     Indebtedness:  Without Lender's prior written consent, no Borrower shall create, incur, assume or suffer to exist any Indebtedness (exclusive of trade debt) except (subject at all times to Borrowers being in compliance with Section 6.6 hereof):

(a)     Indebtedness to Lender;

(b)     Unsecured long term Indebtedness and Indebtedness constituting purchase money indebtedness or capital leases for the financing of capital expenditures so long as such Indebtedness is secured only by a security interest in the equipment being financed and so long as such Indebtedness does not cause, or result in, an Event of Default or Unmatured Event of Default, all on terms satisfactory to Lender in its sole discretion;

(c)     Indebtedness of any Borrower to any other Borrower;

(d)     Indebtedness with financial institutions other than Lender, not to exceed an aggregate principal amount of $25,000.00 at any time; and

(e)     Subordinated debt.

7.7     Loans to Other Persons:  No Borrower shall make or be permitted to have outstanding any loans, advances or extensions of credit to any Person (other than another Borrower) in an aggregate amount not to exceed $15,000.00 at any one time.

7.8     Change in Ownership/Management:  Unless consented to by Lender, no Borrower shall permit its current Shareholders to  at any one time own, legally or beneficially, own less than 80% of the aggregate voting interest of all classes of capital stock of such Borrower, entitled to vote.

7.9     Distributions:  Borrowers shall not declare or pay or make any forms of Distributions to its Shareholders, Affiliates, officers or directors or their respective successors or assigns.

7.10    Subordinated Debt.  Except as set forth in the Subordination Agreements, Borrowers will not make any payments pursuant to the Subordinated Debt.

## SECTION 8. DEFAULT

8.1     Events of Default:  Each of the following events shall constitute an event of default ("Event of Default") and Lender shall thereupon have the option to declare the Obligations immediately due and payable, all without demand, notice, presentment or protest or further action of any kind (it also being understood that the occurrence of any of the events or conditions set forth in subparagraphs (j), (k) or (l) shall automatically cause an acceleration of the Obligations without notice or demand):

(a)     Payments - if Borrowers fail to make any payment of principal or interest on the date when such payment is due and payable and such failure continues for a period of one (1) Business Day; provided, however, that the one (1) Business Day grace period shall not be applicable if such payments are due and payable due to maturity, acceleration or demand, whether following an Event of Default or otherwise; or

22

{00293356;v2}

(b)    Other Charges - if Borrowers fail to pay any other charges, fees, Expenses or other monetary obligations owing to Lender, arising out of or incurred in connection with this Agreement on the date when such payment is due and payable, whether upon maturity, acceleration, demand or otherwise and such failure continues for a period of five (5) Business Days after the earlier of a Borrower becoming aware of such failure or a Borrower receiving written notice of such failure; provided, however, that the five (5) Business Day grace period shall not be applicable if such payments are due and payable due to maturity, acceleration or demand, whether following an Event of Default, or otherwise; or

(c)    Particular Covenant Defaults - if any Borrower fails to perform, comply with or observe any covenant or undertaking contained in this Agreement not otherwise described in this Section 8.1, and such failure continues for a period of five (5) Business Days after the earlier of a Borrower becoming aware of such failure or a Borrower receiving written notice of such failure; or

(d)    Financial Information - if any statement, report, financial statement, or certificate made or delivered by a Borrower or any of their officers, employees or agents, to Lender is not true and correct, in all material respects, when made; or

(e)    Uninsured Loss - if there shall occur any uninsured damage to or loss, theft, or destruction in excess of $25,000.00 with respect to any portion of any Borrower's Property; or

(f)    Warranties or Representations - if any warranty, representation or other statement by or on behalf of Borrowers, or any of them, contained in or pursuant to this Agreement, or in any document, agreement or instrument furnished in compliance with, relating to, or in reference to this Agreement, is false, erroneous, or misleading in any material respect when made; or

(g)    Agreements with Others - if Borrowers, or any of them, shall default beyond any grace period under any agreement with respect to any Indebtedness in excess of $25,000.00 in the aggregate and (i) such default consists of the failure to pay any principal, premium or interest with respect to such Indebtedness or (ii) such default consists of the failure to perform any covenant or agreement with respect to such Indebtedness, if the effect of such default is to cause or permit such Indebtedness to become due prior to its maturity date or prior to its regularly scheduled date of payment;

(h)    Other Agreements with Lender - if Borrowers, or any of them, breach or violate the terms of, or if a default or an event of default, occurs under, any other existing or future agreement (related or unrelated) between or among Borrowers, or any of them and Lender, including without limitation, any lease agreements or finance agreements with any affiliate of Lender; or

(i)    Judgments - if any final judgment for the payment of money in excess of $10,000.00 shall be rendered against Borrowers, or any of them, which is not fully and unconditionally covered by insurance or an appeal bond, or for which such Person has not established a cash or cash equivalent reserve in the amount of such judgment;

(j)    Assignment for Benefit of Creditors, etc. - if Borrowers, or any of them, make or propose an assignment for the benefit of creditors generally, offers a composition or extension to creditors, or makes or sends notice of an intended bulk sale of any business or assets now or hereafter owned or conducted by any Borrower which might materially and adversely affect such Person; or

(k)    Bankruptcy, Dissolution, etc. - upon the commencement of any action for the dissolution or liquidation of Borrowers, or any of them, or the commencement of any proceeding to avoid any transaction entered into by Borrowers, or any of them, or the commencement of any case or proceeding for reorganization or liquidation of Borrowers', or any of their debts under the Bankruptcy Code or any other state or federal law, now or hereafter enacted for the relief of debtors, whether instituted by or against any Borrower; provided, however, that Borrowers shall have forty-five (45) days to obtain the dismissal or discharge of involuntary proceedings filed against a Borrower, it being

23

{00293356;v2}

understood that during such forty-five (45) day period, Lender shall be not obligated to make Advances hereunder and Lender may seek adequate protection in any bankruptcy proceeding; or

        (l)      <u>Receiver</u> - upon the appointment of a receiver, liquidator, custodian, trustee or similar official or fiduciary for Borrowers, or any of them, or for any of any such Borrower's Property; or

        (m)     <u>Execution Process, Seizure, etc.</u> - the issuance of any execution or distraint process against any Borrower, or any of them, or any Property of any such Borrower is seized by any governmental entity, federal, state or local; or

        (n)      <u>Termination of Business</u> - if Borrowers, or any of them, cease any material portion of their business operations as presently conducted, which business operations are not otherwise replaced with additional operations in an amount similar or in excess of those being terminated; or

        (o)      <u>Pension Benefits, etc.</u> - if Borrowers, or any of them, fail to comply with ERISA, so that grounds exist to permit the appointment of a trustee under ERISA to administer Borrower's employee plans or to allow the Pension Benefit Guaranty Corporation to institute proceedings to appoint a trustee to administer such plan(s), or to permit the entry of a Lien to secure any deficiency or claim; or

        (p)      <u>Investigations</u> - any indication or evidence received by Lender that reasonably leads it to believe Borrowers, or any of them, may have directly or indirectly been engaged in any type of activity which would be reasonably likely to result in the forfeiture of any Property of Borrowers, or any of them, to any governmental entity, federal, state or local; or

        (q)      <u>Material Adverse Events</u> -

                (i)      Lender reasonably determines that an event which adversely affects the collectability of a material portion of the Accounts has occurred; or

                (ii)     a material adverse change occurs in the business or financial condition of Borrowers, or any of them.

        8.2    <u>Cure</u>: Nothing contained in this Agreement or the Loan Documents shall be deemed to compel Lender to accept a cure of any Event of Default hereunder.

        8.3    <u>Rights and Remedies on Default</u>:

        (a)      In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents, or otherwise available at law or in equity, upon or at any time after the occurrence and during the continuance of an Event of Default or Unmatured Event of Default, Lender may, in its discretion, withhold or cease making Advances under the Credit Facility.

        (b)      In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents (each of which is also exercisable by Lender), Lender may, in its discretion, upon or at any time after the occurrence of an Event of Default, terminate the Credit Facility (it also being understood that the occurrence of any of the events or conditions set forth in subparagraphs (j), (k) or (l) of Section 8.1 hereof shall automatically cause a termination of the Credit Facility without notice or demand).

        (c)      In addition to all other rights, options and remedies granted or available to Lender under this Agreement or the Loan Documents (each of which is also exercisable by Lender), Lender may, upon or at any time after the occurrence of an Event of Default, exercise all rights under the UCC and any other applicable law or in equity, and under all Loan Documents permitted to be exercised after the occurrence of an Event of Default, including the

24

{00293356;v2}

following rights and remedies (which list is given by way of example and is not intended to be an exhaustive list of all such rights and remedies):

      (i)     The right to "take possession" of the Collateral, and notify all Obligors of Lender's security interest in the Collateral and require payment under the Accounts to be made directly to Lender and Lender may, in its own name or in the name of the applicable Borrower, exercise all rights of a secured party with respect to the Collateral and collect, sue for and receive payment on all Accounts, and settle, compromise and adjust the same on any terms as may be satisfactory to Lender, in its sole and absolute discretion for any reason or without reason and Lender may do all of the foregoing with or without judicial process (including without limitation notifying the United States postal authorities to redirect mail addressed to Borrowers, or any of them, to an address designated by Lender); or

      (ii)     Require Borrowers at Borrowers' expense, to assemble all or any part of the Collateral and make it available to Lender at any place designated by Lender, which may include providing Lender or any entity designated by Lender with access (either remote or direct) to Borrowers' information system for purposes of monitoring, posting payments and rebilling Accounts to the extent deemed desirable by Lender in its sole discretion; or

      (iii)     The right to reduce or modify the Revolving Loan Commitment, Borrowing Base or any portion thereof or the Advance Rate or to modify the terms and conditions upon which Lender may be willing to consider making Advances under the Credit Facility or to take additional reserves in the Borrowing Base for any reason.

      (d)     Borrowers hereby agree that a notice received by them at least ten (10) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made, shall be deemed to be reasonable notice of such sale or other disposition. If permitted by applicable law, any Collateral which threatens to speedily decline in value or which is sold on a recognized market may be sold immediately by Lender without prior notice to Borrowers. Each Borrower covenants and agrees not to interfere with or impose any obstacle to Lender's exercise of its rights and remedies with respect to the Collateral.

      (e)     Lender is hereby granted, until the Obligations are paid in full and all obligations of Lender hereunder are terminated, a worldwide license to use, after the occurrence and during the continuance of an Event of Default and without charge, all of Borrowers' labels, trademarks (and associated goodwill), copyrights, patents and advertising matter, as they pertain to the Collateral, in completing production of, advertising for sale and selling of any Collateral.

    8.4     Nature of Remedies:  All rights and remedies granted Lender hereunder and under the Loan Documents, or otherwise available at law or in equity, shall be deemed concurrent and cumulative, and not alternative remedies, and Lender may proceed with any number of remedies at the same time until all Obligations are satisfied in full.  The exercise of any one right or remedy shall not be deemed a waiver or release of any other right or remedy, and Lender, upon or at any time after the occurrence of an Event of Default, may proceed against Borrowers, or any of them, at any time, under any agreement, with any available remedy and in any order.

    8.5     Set-Off:  If any bank account or other Property held by or with Lender, or any Affiliate of Lender, or any participant is attached or otherwise liened or levied upon by any third party, Lender (and such participant) shall have and be deemed to have, without notice to Borrowers, the immediate right of set-off and may apply the funds or other amounts or property thus set off against any of Borrowers' Obligations hereunder.

    **SECTION 9. MISCELLANEOUS**

    9.1     GOVERNING LAW:  THIS AGREEMENT, AND ALL MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE

25

{00293356;v2}

WITH THE LAWS OF THE COMMONWEALTH OF PENNSYLVANIA. THE PROVISIONS OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS AND ALL OTHER AGREEMENTS AND DOCUMENTS REFERRED TO HEREIN ARE TO BE DEEMED SEVERABLE, AND THE INVALIDITY OR UNENFORCEABILITY OF ANY PROVISION SHALL NOT AFFECT OR IMPAIR THE REMAINING PROVISIONS WHICH SHALL CONTINUE IN FULL FORCE AND EFFECT.

      9.2    <u>Integrated Agreement</u>: The Revolving Credit Note, the Guarantees, the other Loan Documents, all related agreements, and this Agreement shall be construed as integrated and complementary of each other, and as augmenting and not restricting Lender's rights and remedies. If, after applying the foregoing, an inconsistency still exists, the provisions of this Agreement shall constitute an amendment thereto and shall control.

      9.3    <u>Waiver and Indemnity</u>:

      (a)    No omission or delay by Lender in exercising any right or power under this Agreement or any related agreements and documents will impair such right or power or be construed to be a waiver of any default, or Event of Default or an acquiescence therein, and any single or partial exercise of any such right or power will not preclude other or further exercise thereof or the exercise of any other right, and as to any Borrower no waiver will be valid unless in writing and signed by Lender and then only to the extent specified.

      (b)    Each Borrower releases and shall indemnify, defend and hold harmless Lender, and its respective officers, employees and agents, of and from any claims, demands, liabilities, obligations, judgments, injuries, losses, damages and costs and expenses (including, without limitation, reasonable legal fees) resulting from (i) acts or conduct of a Borrower under, pursuant or related to this Agreement and the other Loan Documents, (ii) any Borrower's breach, or alleged breach, or violation of any representation, warranty, covenant or undertaking contained in this Agreement or the other Loan Documents, and (iii) any Borrower's failure, or alleged failure, to comply with any or all laws, statutes, ordinances, governmental rules, regulations or standards, whether federal, state or local, or court or administrative orders or decrees (including without limitation environmental laws, etc.), and all costs, expenses, fines, penalties or other damages resulting therefrom, unless resulting from acts or conduct of Lender constituting willful misconduct or gross negligence.

      (c)    Lender shall not be liable for, and Borrowers hereby agree that Lender's liability in the event of a breach by Lender of this Agreement shall be limited to Borrowers' direct damages suffered and shall not extend to, any consequential or incidental damages. In the event Borrowers bring suit against Lender in connection with the transactions contemplated hereunder, and Lender is found not to be liable, Borrowers shall indemnify and hold Lender harmless from all costs and expenses, including attorneys' fees, incurred by Lender in connection with such suit.

      9.4    <u>Time</u>: Whenever Borrowers, or any of them, shall be required to make any payment, or perform any act, on a day which is not a Business Day, such payment may be made, or such act may be performed, on the next succeeding Business Day. Time is of the essence in Borrowers' performance under all provisions of this Agreement and all related agreements and documents.

      9.5    <u>Expenses of Lender</u>: At Closing and from time to time thereafter, Borrowers will pay all reasonable expenses of Lender on demand (including, without limitation, search costs, audit fees, appraisal fees, and the fees and expenses of legal counsel for Lender) relating to this Agreement, and all related agreements and documents, including, without limitation, expenses incurred in the analysis, negotiation, preparation, closing, administration and enforcement of this Agreement and the other Loan Documents, the enforcement, protection and defense of the rights of Lender in and to the Loans and Collateral or otherwise hereunder, and any reasonable expenses relating to extensions, amendments, waivers or consents pursuant to the provisions hereof, or any related agreements and documents or relating to agreements with other creditors, or termination of this Agreement (collectively, the "**Expenses**"). Any Expenses not paid upon demand by Lender shall bear interest at the highest per annum rate of interest applicable to the Loans.

      9.6    <u>Confidentiality</u>: Except as provided in Section 9.19 hereof or to the extent required by law or applicable regulations or in the event of a dispute involving this Agreement, Borrowers and Lender agree to maintain the

26

{00293356;v2}

confidentiality of this Agreement and not to disclose the contents hereof or provide a copy hereof to any third party, except (i) accountants, lawyers and financial advisers of the parties who are informed of and agree to be bound by this Section 9.6, and (ii) that copies hereof may be provided to any assignee or participant (or potential assignee or participant) of Lender's interests herein.

9.7    Notices:

(a)    Any notices or consents required or permitted by this Agreement shall be in writing and shall be deemed given if delivered in person or if sent by e-mail, telecopy or by nationally recognized overnight courier, or via first class, Certified or Registered mail, postage prepaid, to the address of such party set forth on the signature pages hereof, unless such address is changed by written notice hereunder.

(b)    Any notice sent by Lender or Borrowers, or any of them, by any of the above methods shall be deemed to be given when so received.

(c)    Lender shall be fully entitled to rely upon any facsimile transmission or other writing purported to be sent by any Authorized Officer (whether requesting an Advance or otherwise) as being genuine and authorized.

9.8    Brokerage: Borrowers represent that Borrowers have not committed Lender to the payment of any brokerage fee, commission or charge in connection with this transaction. If any such claim is made on Lender by any broker, finder or agent or other Person, each Borrower hereby indemnifies, defends and saves Lender harmless against such claim and further will defend, with counsel satisfactory to Lender, any action or actions to recover on such claim, at Borrowers' own cost and expense, including Lender's reasonable counsel fees. Each Borrower further agrees that until any such claim or demand is adjudicated in Lender's favor, the amount demanded shall be deemed an Obligation of Borrowers under this Agreement.

9.9    Headings: The headings of any paragraph or Section of this Agreement are for convenience only and shall not be used to interpret any provision of this Agreement.

9.10    Survival: All warranties, representations, and covenants made by any or all Borrowers and/or Guarantors herein, or in any agreement referred to herein or on any certificate, document or other instrument delivered by it or on its behalf under this Agreement, shall be considered to have been relied upon by Lender, and shall survive the delivery to Lender of the Note, regardless of any investigation made by Lender or on its behalf. All statements in any such certificate or other instrument prepared and/or delivered for the benefit of Lender shall constitute warranties and representations by Borrowers hereunder. Except as otherwise expressly provided herein, all covenants made by any or all Borrowers hereunder or under any other agreement or instrument shall be deemed continuing until all Obligations are satisfied in full.

9.11    Successors and Assigns: This Agreement shall inure to the benefit of and be binding upon the successors and assigns of each of the parties. No Borrower may transfer, assign or delegate any of its duties or obligations hereunder.

9.12    Duplicate Originals: Two or more duplicate originals of this Agreement may be signed by the parties, each of which shall be an original but all of which together shall constitute one and the same instrument. This Agreement may be executed in counterparts, all of which counterparts taken together shall constitute one completed fully executed document. Signature by facsimile shall bind the parties hereto.

9.13    Modification: No modification hereof or any agreement referred to herein shall be binding or enforceable unless in writing and signed by Borrowers and Lender.

9.14    Signatories: Each individual signatory hereto represents and warrants that he is duly authorized to execute this Agreement on behalf of his principal and that he executes the Agreement in such capacity and not as a party.

27

{00293356;v2}

9.15    Third Parties: No rights are intended to be created hereunder, or under any related agreements or documents for the benefit of any third party donee, creditor or incidental beneficiary of any Borrower. Nothing contained in this Agreement shall be construed as a delegation to Lender of any Borrower's duty of performance, including, without limitation, such Borrower's duties under any account or contract with any other Person.

9.16    Waivers:

(a)     Borrowers each hereby irrevocably, unconditionally and fully subordinate in favor of Lender, any and all rights they or any of them, may have at any time (whether arising directly or indirectly, by operation of law or contract) to assert or receive payment on any claim against each other or any of them, on account of payments made under this Agreement, including without limitation, any and all rights of subrogation, reimbursement, exoneration, contribution or indemnity. Each Borrower waives any event or circumstances which might constitute a legal or equitable defense of, or discharge of, such Borrower. Furthermore, each Borrower agrees that if any payment on the Obligations is recovered from or repaid by Lender in whole or in part in any bankruptcy, insolvency or similar proceeding instituted by or against any Borrower, the remaining Borrowers and/or Guarantors shall be obligated to the same extent as if the recovered or repaid payment had never been originally made on such Obligation. Each Borrower consents and agrees that Lender shall be under no obligation to marshal any assets or Collateral in favor of such Borrower or against or in payment of any or all of the Obligations.

(b)     Each Borrower hereby consents and agrees that Lender, at any time or from time to time in its discretion may: (i) settle, compromise or grant releases for liabilities of other Borrowers, and/or any other Person or Persons liable for any Obligations, (ii) subject to the terms of this Agreement, exchange, release, surrender, sell, subordinate or compromise any Collateral of any party now or hereafter securing any of the Obligations, and (iii) following an Event of Default, apply any and all payments received at any time against the Obligations in any order as Lender may determine; all of the foregoing in such manner and upon such terms as Lender may see fit, without notice to or further consent from such Borrower who hereby agrees and shall remain bound upon this Agreement notwithstanding any such action on Lender's part.

(c)     The liability of each Borrower hereunder is absolute and unconditional and shall not be reduced, impaired or affected in any way by reason of (i) any failure to obtain, retain or preserve, or the lack of prior enforcement of, any rights against any Person or Persons (including other Borrowers), or in any Property, (ii) the invalidity or unenforceability of any Obligations or rights in any Collateral, (iii) any delay in making demand upon other Borrowers or any delay in enforcing, or any failure to enforce, any rights against other Borrowers or in any Collateral even if such rights are thereby lost, (iv) any failure, neglect or omission to obtain, perfect or retain any lien upon, protect, exercise rights against, or realize on, any Property of any Borrower, or any other party securing the Obligations, (v) the existence or non-existence of any defenses which may be available to the other Borrowers with respect to the Obligations, or (vi) the commencement of any bankruptcy, reorganization, liquidation, dissolution or receivership proceeding or case filed by or against any of Borrowers.

9.17    CONSENT TO JURISDICTION: EACH BORROWER AND LENDER HEREBY IRREVOCABLY CONSENT TO THE NON-EXCLUSIVE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN THE COMMONWEALTH OF PENNSYLVANIA IN ANY AND ALL ACTIONS AND PROCEEDINGS WHETHER ARISING HEREUNDER OR UNDER ANY OTHER AGREEMENT OR UNDERTAKING. BORROWERS WAIVE ANY OBJECTION TO IMPROPER VENUE AND FORUM NON-CONVENIENS TO PROCEEDINGS IN ANY SUCH COURT AND ALL RIGHTS TO TRANSFER FOR ANY REASON. EACH BORROWER IRREVOCABLY AGREES TO SERVICE OF PROCESS BY CERTIFIED MAIL, RETURN RECEIPT REQUESTED TO THE ADDRESS OF THE APPROPRIATE PARTY SET FORTH HEREIN.

9.18    WAIVER OF JURY TRIAL: EACH BORROWER AND LENDER HEREBY WAIVE ANY AND ALL RIGHTS IT MAY HAVE TO A JURY TRIAL IN CONNECTION WITH ANY LITIGATION COMMENCED BY OR AGAINST LENDER WITH RESPECT TO RIGHTS AND OBLIGATIONS OF THE

28

{00293356;v2}

PARTIES HERETO OR UNDER THE LOAN DOCUMENTS, WHETHER SOUNDING IN TORT, CONTRACT OR OTHERWISE.

9.19    Publication: Borrowers grant Lender the right to publish and/or advertise information to the effect that this transaction has closed, which information may include, without limit, (i) the names of Borrowers and Lender, (ii) the size of the transaction and (iii) those items of information commonly included within a "tombstone advertisement" of the type customarily published in financial or business periodicals.

9.20    Discharge of Taxes, Borrower's Obligations, Etc.: Lender, in its sole discretion, shall have the right at any time, and from time to time, with prior notice to Borrowers, if Borrowers fail to do so five (5) Business Days after requested in writing to do so by Lender, to: (a) pay for the performance of any of Borrowers' obligations hereunder, and (b) discharge taxes or liens, at any time levied or placed on any of Borrowers' Property in violation of this Agreement unless Borrowers are in good faith with due diligence by appropriate proceedings contesting such taxes or liens and have established appropriate reserves therefor under GAAP.  Expenses and advances shall be deemed Advances hereunder and shall be deemed Advances hereunder and shall bear interest at the highest rate applied to the Loans until reimbursed to Lender.  Such payments and advances made by Lender shall not be construed as a waiver by Lender of an Event of Default under this Agreement.

(a)    Injunctive Relief:  The parties acknowledge and agree that, in the event of a breach or threatened breach of any party's obligations hereunder, that party may have no adequate remedy in money damages and, accordingly, shall be entitled to an injunction (including without limitation, a temporary restraining order, preliminary injunction, writ of attachment, or order compelling an audit) against such breach or threatened breach, including without limitation, maintaining the cash management and collection procedure described herein.  However, no specification in this Agreement of a specific legal or equitable remedy shall be construed as a waiver or prohibition against any other legal or equitable remedies in the event of a breach or threatened breach of any provision of this Agreement.

[Remainder of Page Intentionally Left Blank]

29

IN WITNESS WHEREOF, this Agreement has been duly executed as of the day and year first above written.

Address for notices to Borrower:

Dryden Advisory Group, LLC
5913 Linglestown Road
Lower Paxon, PA 17112
Attn: John Ridley

Borrowers:

DRYDEN ADVISORY GROUP, LLC
By: Kevjohn, Inc., Manager

By: _John O. Ridley_ President
     John O. Ridley, President/Secretary

Address for notices
to Lender:

Beneficial Mutual Savings Bank
530 Walnut Street
Philadelphia, PA 19106
Attn: Mark Tressel

Lender:

BENEFICIAL MUTUAL SAVINGS BANK

By: _____
Name: _MARK G. TRESSEL_
Title: _VICE PRESIDENT_

S-1

{00293356;v2}

Exhibit A

Form of Borrowing Base Report

See attached.

{00293356;v2}

**■■■■■■■■■■■■■■■■**

File Number: 2011080903663
Date Filed: 08/08/2011 08:00 AM
Carol Alchele
Secretary of the Commonwealth

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Ceily Stanton                     30001

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

PENNCORP SERVICEGROUP, INC.
600 NORTH SECOND STREET
PO BOX 1210
HARRISBURG, PA 17108-1210

Commonwealth of Pennsylvania
UCC1 Initial Filing 2 Page(s)

T1122165025

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (1a or 1b) - do not abbreviate or combine names

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Dryden Advisory Group, LLC | | | | |

OR

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 5913 Linglestown Road | Lower Paxton | PA | 17112 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | Pennsylvania | 2775521 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - Insert only one debtor name (2a or 2b) - do not abbreviate or combine names

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |

OR

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | | | | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - Insert only one secured party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| Beneficial Mutual Savings Bank | | | | |

OR

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 530 Walnut Street | Philadelphia | PA | 19106 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ALL ASSETS, including but not limited to the assets listed on Exhibit A which is attached hereto and
incorporated herein by reference as if fully set forth.

| 5. ALTERNATIVE DESIGNATION [if applicable] | | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|---|

| 6. This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. Attach Addendum [if applicable] | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |
|---|---|---|---|---|

| 8. OPTIONAL FILER REFERENCE DATA | | |
|---|---|---|
| Filed with: PA - Secretary of the Commonwealth Client# 2378-047   GP 44226350-01 | F#311871 | A#457899 |

FILING OFFICE COPY — UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

15240

## EXHIBIT A TO UCC-1 FINANCING STATEMENT

All tangible and intangible property of the Debtor, whether now owned or hereafter acquired, wherever located, including, but not limited to, the Debtor's interest now owned and hereafter acquired in the following types or items of property (all terms used herein shall have the meanings set forth in Article 9 of the Uniform Commercial Code):

**All Accounts.** A security interest in all accounts now owned or existing as well as any and all that may hereafter arise or be acquired by Debtor, and all the proceeds and products thereof, including without limitation, all notes, drafts, acceptances, instruments and chattel paper arising therefrom, and all returned or repossessed goods arising from or relating to any which accounts, or other proceeds of any sale or other disposition of inventory, together with any property evidencing or relating to the Accounts (such as guaranties and credit insurance), any security for the Accounts, and all books and records relating thereto (including, but not limited to, computer-generated and/or computer-prepared information).

**All Inventory.** A security interest in all of Debtor's inventory, including all goods, merchandise, raw materials, goods, goods in process, finished goods, parts, supplies and other tangible personal property, wheresoever located, now owned or hereafter acquired and held for sale or lease or furnished or to be furnished under contracts for service or used or consumed in Debtor's business, and all additions and accessions thereto, and all leases and contracts with respect thereto, and all documents of title evidencing. or representing any part thereof, and all products and proceeds thereof, whether in the possession of the Debtor, warehouseman, bailee, or any other person, and all goods and inventory returned, reclaimed or repossessed.

**All Equipment, Furniture and other Tangible Property.** A security interest in all equipment, furniture and other tangible property of every nature and description whatsoever (whether or not any of the foregoing are affixed to realty), now owned or hereafter acquired by Debtor, including all appurtenances and additions thereto, and substitutions therefor and replacement thereof, wheresoever located, including all tools, parts and accessories used in connection therewith, and the rights of the Debtor under any manufacturer's warranties relating to the foregoing.

**General Intangibles.** A security interest in all general intangibles and other personal property now owned or hereafter acquired by Debtor (including, without limitation, all payment intangibles and any personal property, causes of action, goodwill, tax refunds, licenses, franchises, trademarks, trade names, service marks, copyrights, customer lists, and patents, and all rights under license agreements for use of the same) other than goods, accounts, chattel paper, documents or instruments.

**Chattel Paper.** A security interest in all of Debtor's interest under chattel paper, lease agreements and other instruments or documents (whether tangible or electronic), whether now existing or owned by Debtor or hereafter arising or acquired by Debtor, evidencing both a debt and security interest in or lease of specific goods.

**Instruments.** A pledge and assignment of and security interest in all of Debtor's Instruments (including, without limitation, all promissory notes and all certificated securities and all certificates of deposit) now owned or existing as well as hereafter acquired or arising instruments and documents.

as well as any accessions, additions and attachments thereto, and the proceeds and products thereof, including without limitation, all cash, general intangibles, accounts, inventory, equipment, fixtures, farm products, notes, drafts, acceptances, securities, instruments, chattel paper, insurance proceeds payable because of loss or damage, or other property, benefits or rights arising therefrom, and in and to all returned or repossessed goods arising from or relating to any of the property described herein or other proceeds of any sale or other disposition of such property (including, without limitation, whatever is received upon the use, lease, sale, exchange, collections, any other utilization, or any disposition of any of the foregoing property, whether cash or non-cash, all rental or lease payments, accounts, chattel paper, instruments, documents, contract rights, general intangibles, machinery, equipment, inventory, substitutions, additions, accessions, replacements, products, and renewals of, for, or to such property, and all insurance therefor).

# EXHIBIT B

| | |
|---|---|
| **From:** | John Ridley <jridley@drydenllc.com> |
| **Sent:** | Thursday, July 12, 2012 12:06 PM |
| **To:** | Mark Tressel; 'David Puyear' |
| **Cc:** | 'Mike Ryan'; fkaplan@kaplanfcg.com |
| **Subject:** | Re: Dryden Advisory Group Nonrecourse Factoring Contract.pdf - Adobe Acrobat Professional |

Ok, let's get this done for
everyone benefit

Thanks you

John
Sent from my Verizon Wireless BlackBerry

**From:** Mark Tressel <MTressel@thebeneficial.com>
**Date:** Thu, 12 Jul 2012 11:52:55 -0400
**To:** 'David Puyear'<dpuyear@innovfs.net>; 'John Ridley'<jridley@drydenllc.com>
**Cc:** 'Mike Ryan'<mryan@innovfs.net>; fkaplan@kaplanfcg.com<fkaplan@kaplanfcg.com>
**Subject:** RE: Dryden Advisory Group Nonrecourse Factoring Contract.pdf - Adobe Acrobat Professional

John,

The legal fee estimate is for between $750 - $1,250. They need to review the entire contract along with the attachments, and prepare and file the UCC release. In the unlikely event that it turns into a negotiation over an intercreditor agreement, then the fee would increase.

To move forward, I need confirmation from John that this is acceptable and that we can pay the legal fee from the first round if funding that will also be paying the loan payments that were previously discussed.

Mark

**From:** David Puyear [mailto:dpuyear@innovfs.net]
**Sent:** Thursday, July 12, 2012 10:17 AM
**To:** Mark Tressel
**Cc:** 'Mike Ryan'; 'John Ridley'; fkaplan@kaplanfcg.com
**Subject:** FW: Dryden Advisory Group Nonrecourse Factoring Contract.pdf - Adobe Acrobat Professional

Mark,

We had a conference call today with Durham Capital who has approved the A/R Factoring for the two Fiserv invoices.

They have revised the contracts for your review. However, they did confirm on our call, that this is a non-recourse contract. The security (behind the bank) is only in the event that the A/R is not real (or is fraudulently factored by the Company). As such, the only practical requirements for would be to file a UCC release for just

1

those two invoices. They will file a UCC on the same invoices. They will further confirm with Fiserv that they are valid invoices to be paid.

As such, according to Durham, this contract essentially is belt and suspenders in the event the A/R is not real.

It might be best for us to have a very brief call with them to have them explain this to the Bank before we spend too much time on legal review / cost. Please let me know if you are available this afternoon between 1PM and 3PM and we can confirm the time with Durham. Thanks.

Regards, Dave


David D. Puyear, CFO / COO
Innovative Financing Solutions
218 Ardmore Ave.
Ardmore, PA 19003
Office: (610) 228-4654
Fax:    (484) 485-2757
Direct: (215) 901-9698

E mail:   Dpuyear@InnovFS.net
Website: www.innovativefinancingsolutions.net



**innovative**Financing SOLUTIONS

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful. Any perceived U.S. Federal tax advice contained herein is not intended or written to be used, and cannot be used by any recipient of this email, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code, all as in accordance with Treasury Department Circular 230.

**From:** Scott DiBerardinis [mailto:sdiberardinis@durhamcommercialcapital.com]
**Sent:** Thursday, July 12, 2012 10:03 AM
**To:** dpuyear@innovfs.net; jridey@drydenllc.com
**Cc:** fkaplan@kaplanfcg.com
**Subject:** FW: Dryden Advisory Group Nonrecourse Factoring Contract.pdf - Adobe Acrobat Professional

Gentleman,

This contract simply states that we will take a security interest in the collateral, NOT a first security interest. We understand that we will be in third position behind the SBA and Beneficial.


Thanks and Cheers,

Scott


**From:** Tim Mura [mailto:tmura@durhamcommercialcapital.com]
**Sent:** Thursday, July 12, 2012 9:56 AM

**To:** sdiberardinis@durhamcommercialcapital.com
**Subject:** Dryden Advisory Group Nonrecourse Factoring Contract.pdf - Adobe Acrobat Professional

Scott,

Please forward this contract to the appropriate parties. In your cover letter/email, inform them that this contract simply states that we will take a security interest in the collateral, NOT a first security interest.

Tim Mura
Durham
Ph: 585-218-8610, x226
Fx: 585-218-9033

# EXHIBIT C

**From:** David Puyear [mailto:dpuyear@innovfs.net]
**Sent:** Wednesday, July 18, 2012 3:45 PM
**To:** Mark Tressel
**Cc:** 'Michael Ryan'; jridley@drydenllc.com
**Subject:** FW: Beneficial - Dryden (Factoring Agreement Comments)
**Importance:** High

Mark,

Please note that Durham will agree to the change on the contract. They do ask you to sign the attached simple acknowledgement. This should not be problematic. Please not, I think we have got them to agree to everything the Bank has asked. However, I do ask you to promptly return the attached, without delay. Please not, they appear to be getting some fatigue, so I do suggest we accommodate this request. They will then make the changes to the contract, to get this agreement signed to complete the financing.

Regards, Dave

David D. Puyear, CFO / COO

1

Innovative Financing Solutions
218 Ardmore Ave.
Ardmore, PA 19003
Office: (610) 228-4654
Fax:    (484) 485-2757
Direct: (215) 901-9698

E mail:   Dpuyear@InnovFS.net
Website: www.innovativefinancingsolutions.net



**innovativeFinancing** SOLUTIONS

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful. Any perceived U.S. Federal tax advice contained herein is not intended or written to be used, and cannot be used by any recipient of this email, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code, all as in accordance with Treasury Department Circular 230.

**From:** Scott DiBerardinis [mailto:sdiberardinis@durhamcommercialcapital.com]
**Sent:** Wednesday, July 18, 2012 3:41 PM
**To:** 'David Puyear'; jridley@drydenllc.com
**Cc:** fkaplan@kaplanfcg.com
**Subject:** RE: Beneficial - Dryden (Factoring Agreement Comments)
**Importance:** High

Hello gentleman,

This is the  document that has to be sent over to Beneficial for their signature, As I mentioned before, Durham is willing to comply with all changes in the contract per-Beneficial's request. Once the document is signed and sent back we can then revise our current contract to reflect Beneficial's changes.  Please note if Beneficial is not willing to work with Durham and sign the attached document then we will have to pass on this opportunity.

Cheers,

Scott

---

**From:** David Puyear [mailto:dpuyear@innovfs.net]
**Sent:** Wednesday, July 18, 2012 8:51 AM
**To:** 'Scott DiBerardinis'; jridley@drydenllc.com
**Cc:** fkaplan@kaplanfcg.com
**Subject:** RE: Beneficial - Dryden (Factoring Agreement Comments)

Scott,

In speaking to John Ridley, he indicated the best person to confirm the validity of the Fiserv pending tax refund and the associated fees owed Dryden Advisory Group would Fiserv attorney that is handling this matter and will actually process the receipt of the tax refund and the payment of the fees to Dryden (or Durham).

This is the attorney's contact information:

**From:** David Puyear [mailto:dpuyear@innovfs.net]
**Sent:** Tuesday, July 17, 2012 11:55 AM
**To:** 'Scott DiBerardinis'
**Cc:** fkaplan@kaplanfcg.com; 'Michael Ryan'; 'John Ridley'
**Subject:** FW: Beneficial - Dryden (Factoring Agreement Comments)
**Importance:** High

Scott,

For the sake of time, I will forward the Bank's comments for your review with a copy to Fred Kaplan. Please let us know if you can accept these changes so the agreement can be revised and we can finalize this transaction.

I think this additional time to revise the agreement for this first factoring will enable Dryden to easily factor other A/R going forward, with a simple UCC release from the bank.

Regards, Dave

David D. Puyear, CFO / COO
Innovative Financing Solutions
218 Ardmore Ave.
Ardmore, PA 19003
Office: (610) 228-4654
Fax:     (484) 485-2757
Direct:  (215) 901-9698

E mail:   Dpuyear@InnovFS.net
Website: www.innovativefinancingsolutions.net



**innovative**Financing**SOLUTIONS**

This message and any attachments may contain confidential or privileged information and are only for the use of the intended recipient of this message. If you are not the intended recipient, please notify the sender by return email, and delete or destroy this and all copies of this message and all attachments. Any unauthorized disclosure, use, distribution, or reproduction of this message or any attachments is prohibited and may be unlawful. Any perceived U.S. Federal tax advice contained herein is not intended or written to be used, and cannot be used by any recipient of this email, for the purpose of avoiding any penalties that may be imposed by the Internal Revenue Code, all as in accordance with Treasury Department Circular 230.

**From:** Mark Tressel [mailto:MTressel@thebeneficial.com]
**Sent:** Tuesday, July 17, 2012 11:50 AM
**To:** 'David Puyear'; 'John Ridley'
**Cc:** 'Michael Ryan'
**Subject:** FW: Beneficial - Dryden (Factoring Agreement Comments)
**Importance:** High

Please see the attached comments to the factoring agreement. Hopefully the revisions can be made quickly.

**From:** Kimberly Rayer [mailto:KRayer@starfieldsmith.com]
**Sent:** Tuesday, July 17, 2012 11:42 AM
**To:** Mark Tressel

# EXHIBIT D

**From:** Scott DiBerardinis [mailto:sdiberardinis@durhamcommercialcapital.com]
**Sent:** Friday, July 20, 2012 1:59 PM
**To:** fkaplan@kaplanfcg.com; jridley@drydenllc.com; 'David Puyear'; 'Michael Ryan'
**Subject:** FW: Revised Dryden Contract.pdf - Adobe Acrobat Professional
**Importance:** High

1

Hello gentleman,

We are pleased to say after a long conversation we can work with Beneficial's language. Attached to this email is the revised contract, John, we are going to need you to go through and re-initial and sign the contract. We will also need someone to follow up with Fiserv and the attorney( William Felker, Esquire) regarding confirmation of invoice and notice of assignment. As of today we still have not heard anything back from either of them.


Cheers,


Scott DiBerardinis
Durham Commercial Capital
office 585-218-8610 ext. 237
cell   585-455-2985
sdiberardinis@durhamcommercialcapital.com

# NONRECOURSE RECEIVABLES PURCHASE CONTRACT AND SECURITY AGREEMENT

This Factoring and Security Agreement is dated July 6, 2012, by and between the undersigned Dryden Advisory Group, LLC, a Pennsylvania Limited Liability Company (hereinafter referred to as "Client" or "Seller"), which has its offices and principal place of business at 4811 Jonestown Road, Harrisburg, PA 17109, and Durham Commercial Capital Corp. (hereinafter, "Durham" or "Purchaser"). Client and Durham agree as follows:

1. **PURPOSE OF AGREEMENT -** Client desires to obtain a true nonrecourse sale of its accounts receivable to Durham. Durham agrees to purchase accounts receivable from Client. The purpose of this transaction is commercial in nature, and not for household, family, and/or personal use. In the event Client and Durham arc currently operating under an earlier Agreement, this Agreement is and shall be a modification and continuation of such earlier Agreement and in the event of any inconsistencies or contradictions within the Agreements, Client and Durham agree that the terms of this Agreement shall control. This Agreement shall be in effect for twenty four (24) months from the date hereof and shall automatically renew for twenty four (24) months thereafter unless Client provides Durham written notice of termination 90 days prior to expiration.

2. **DEFINITIONS**

    2.1. "Account" means both present and future accounts, contract rights and other forms of obligations for the payment of money arising out of the sale by Client of goods or the performance by Client of services.

    2.2. "Acceptable Account" or "Purchased Account" means an Account offered by Client to Durham for sale which Account Durham has reviewed and has, in its sole discretion, approved for purchase in whole or in part, and which Account conforms to the warranties and terms set forth herein and in the Assignment Schedule form accompanying each offer to sell.

    2.3. "Affiliate" means any entity that Client or any officer, shareholder, director or other principal of Client or any spouse or other familial relative of such person shall have the power to direct the management and policies of such entity, directly or indirectly, whether through ownership of voting securities or otherwise.

    2.4. "Credit and Collection Services" – the following services performed by Durham on behalf of Client as a result of the purchase of accounts hereunder:

    2.4.1. All accounts receivable record keeping, including the recording of invoices and payments;

    2.4.2. Assumption of the credit risk with respect to Purchased Accounts, as set forth herein;

    2.4.3. Collection of accounts; and

    2.4.4. Setting of such credit limits for sales by Client to its Customers as may be required.

    2.5. "Customer" means Client's customer also known as the account debtor.

    2.6. "Early Termination Date" – any termination date requested by Seller which is earlier than the next occurring Anniversary Date.

    2.6.1. "Notice of Early Termination" – Client shall provide Durham with 90 days prior written notice of a termination date prior to the next occurring Anniversary Date.

Initials: _____

1

2.7. "Early Termination Fee" – The greater of the (i) average monthly Factoring Fees earned by Durham for the three full months (or portion thereof) prior to the date on which Durham receives a Notice of Early Termination of this Agreement, or (ii) the Minimum Monthly Fee of $1,500.00, multiplied by the number of months remaining in this Agreement.

2.8. "Invoice" means the Document evidencing any Account referenced in and made subject to any Assignment Schedule entered into between the Client and Durham.

2.9. "Maximum Amount" is the outstanding amount of Client's account with Durham (that is, at any time, the full amount of advances made by Durham to Client to purchase accounts) shall not exceed $350,000.00.

2.10. "Misdirected Payment Fee" – fifteen percent (15%) of the amount of any payment on account of a Purchased Account which has been received by Client and not delivered in kind to Durham on the next business day following the date of receipt by Client.

2.11. "Missing Notation Fee" – 15% of the Face Amount. "Notation" – "This account has been assigned and is payable directly to Durham Commercial Capital Corp., mailing address 101 Sully's Trail, Bldg. 20, Pittsford, NY 14534, to whom notice of any claim or dispute must be advised in writing."

2.12. "Reserve Account" means a bookkeeping account on the books of Durham representing the unpaid portion of an Acceptable Account sold and assigned hereunder by Client to Durham or any Account that is subject to the security hereunder granted to Durham by Client or otherwise coming into the possession or control of Durham.

2.13. "Obligations" – all present and future obligations owing by Client to Durham whether or not for the payment of money, whether or not evidenced by any note or other instrument, whether direct or indirect, absolute or contingent, due or to become due, joint or several, primary or secondary, liquidated or un-liquidated, secured or unsecured, original, renewed, or extended, whether arising before, during, or after the commencement of any bankruptcy case in which Client is a Debtor, including but not limited to any obligations arising pursuant to letters of credit or acceptance transactions or any other financial accommodations.

## 3. WARRANTIES AND COVENANTS BY CLIENT

3.1. Client's business is solvent, and Client is presently paying its debts as they become due. Client has never filed for bankruptcy under federal or state law or had an involuntary bankruptcy petition filed against it. Client has made and shall continue to make timely payment of all required taxes. To the best of Client's knowledge and based on Client's reasonable business practices, each Customer is solvent.

3.2. Each Acceptable Account offered for sale to Durham hereunder is and shall be, as of the time of such offer, a bona fide and existing obligation of Client's Customer for the payment of money arising out of the sale by Client of goods or the performance by Client of services, which is owed to Client, free from any liens, claims, disputes, off-sets or equities of third parties, that Client is the lawful owner of and has good and undisputed title to the Acceptable Accounts offered for sale to Durham hereunder, and that no Acceptable Account offered or to be offered for sale to Durham hereunder represents consigned or guaranteed sales, and that no Acceptable Account offered or to be offered for sale and assignment shall be due from an Affiliate. Notwithstanding the foregoing, Durham acknowledges that Beneficial Bank has a first and prior lien on all Collateral, including Accounts (other than Purchased Accounts)("Senior Lien"). Borrower shall not offer to Durham any Account for purchase, without Beneficial's prior written consent to release its Senior Lien on such Account, if it is deemed an Acceptable Account by Durham.

3.3. Except for the Senior Lien, Client has not transferred, pledged or granted a security interest in Client's Accounts to any other party and Client will not transfer, pledge or grant a security

Initials: _____                                                                                2

interest to any other party in said Accounts for the term of this agreement and for as long as Client is indebted to Durham hereunder. Additionally, Client will not sell or assign Accounts except to Durham for the period of this agreement, and/or for as long as any indebtedness whatsoever remains owing by Client to Durham.

3.4. Financial Information: Client will furnish Durham financial statements as reasonably required by Durham from time to time and will furnish Durham, upon request, satisfactory proof of payment and/or compliance with all Federal, State and/or local tax requirements, accounts receivable and payable aging reports, monthly P & L statements, and proof of payment of any debts owing by Client. Durham will keep any information it receives with respect to the financial or other records of Client or Client's Customers strictly confidential. This covenant of confidentially survives this Agreement.

3.5. All financial records, statements, books or other documents shown to Durham by Client at any time, either before or after the signing of this Agreement, are true and accurate to the best of Client's belief. Without expense to Durham, Durham may use any of Client's personnel, equipment, including computer equipment, programs, printer output, and computer readable media, supplies and premises for the collection of accounts and realization on other Collateral as Durham, in its sole discretion, deems appropriate. Client hereby irrevocably authorizes all accountants and third parties to disclose and deliver to Durham at Client's expense all financial information books and records, work papers, management reports, and other information in their possession relating to Client.

3.6. Durham or any person designated by Durham shall have the right at any reasonable time with 24 hours notice to inspect, audit, check and make copies or extracts from Client's books, records, journals, orders, receipts, and other correspondence and other data relating to Client's business and any other transaction between Durham and Client without hindrance or delay.

3.7. Client will promptly notify Durham in writing of any change in the location of Client's place(s) of business, name, post office address, identity, legal entity, corporate structure, officers, principals, partners, and/or owners.

3.8. Client has full power and authority to execute, deliver and perform this Agreement.

4. **FURTHER PROMISES**

4.1. Security Interest Collateral: Client gives to Durham, as collateral for the repayment of any and all obligations and liabilities whatsoever of Client to Durham, a security interest, in the following described property ("Collateral"):

4.2. "Collateral" – any collateral now and hereafter described in any form UCC-1 filed against Client naming Durham as the secured party, and all Client's right, title and interest in and to the following property, now owned and hereafter acquired:

4.2.1. All Accounts (including Accounts purchased by Durham hereunder and repurchased by Client), promissory notes, chattel paper, general intangibles including, but not limited to, tax refunds, registered and unregistered patents, trademarks, service marks, copyrights, trade names, trade secrets, customer lists, licenses, documents, instruments, deposit accounts, certificates of deposit, and all rights of Client as a seller of goods, including rights of reclamation, repletion and stoppage in transit;

4.2.2. All goods including but not limited to:

4.2.3. All inventory, wherever located;

4.2.4. All equipment and fixtures, wherever located, and all additions, substitutions, replacements (including spare parts), and accessions thereof and thereto;

Initials: _____                                                                                          3

4.2.5. All books and records relating to all of the foregoing property and interests in property including, without limitation, all computer programs, printer output and computer readable data in the possession or control of the Client, any computer service bureau, or other third party;

4.2.6. All investment property; and

4.2.7. All proceeds of the foregoing, including, but not limited to, all insurance proceeds, all claims against third parties for loss or destruction of or damage to any of the foregoing, and all income from the lease or rental of any of the foregoing.

4.3. Notwithstanding anything to the contrary contained herein, Durham hereby acknowledges and agrees that the Collateral is subject to the Senior Lien in favor of Beneficial Bank, further Durham shall not exercise any rights and remedies against such Collateral, unless all obligations outstanding to Beneficial Bank are paid in full and satisfied and the Senior Lien has been terminated. For the purposes of this Agreement, Purchased Accounts shall not be deemed to be Collateral, unless repurchased by Client pursuant to the terms of this Agreement.

4.4. Notification: Durham may notify any Customer to make payments directly to Durham for any Account.

4.5. Assignment: Client shall sell transfer and assign certain Accounts, at its discretion, to Durham, to be identified on a form known as Durham's Assignment Schedule of Invoices together with an original Invoice and all supporting documents appropriate to Client's business.

4.6. Purchase Price: Each Acceptable Account purchased by Durham hereunder shall be purchased for a price equal to the net amount of such Acceptable Account. As used herein, the "net amount" of an Acceptable Account means the face amount thereof less discounts or allowances of any nature, calculated on the basis of the shortest selling terms provided.

4.7. Fees: Durham agrees to purchase Acceptable Accounts and provide the Credit and Collection Services set forth herein to Client for the fees as indicated below:

4.7.1. The factoring fee shall be 3.5% of the original face amount of each purchased account, to be paid on the date on which the account is purchased (the "Purchase Date"), and commencing on the 30th day following the Purchase Date, an additional 1.75% of the face amount for each fifteen (15) day period thereafter until Durham has received the face amount, either from the Customer or the Client.;

4.7.2. an initial fee of $1,000.00 payable upon the signing of this agreement and on each anniversary date hereafter; and

4.7.3. all other costs incurred by Durham including all bank fees for wire transfers, lien search fees, lien recording fees.

4.8. Date of Advance: Durham will buy Acceptable Accounts at the net amount less any specified reserve which will be advanced to Client at the time the Account is accepted.

4.9. Reserve: Durham will reserve and withhold an amount in a reserve account equal to twenty five percent (25%) of the face amount of each Account purchased hereunder. The reserve account may be held by Durham and applied against any obligations of Client or any Affiliate of Client to Durham, known or anticipated, and the reserve account shall not be due and payable to Client until any and all obligations of Client to Durham are fully paid and/or satisfied. Notwithstanding the foregoing, as each Acceptable Account is paid in full, the reserve associated with the paid Acceptable Account will be paid to Client provided, however, there does not then exist an event or condition of default and further provided, however, that in no event at any time shall the aggregate balance in the reserve account be less than twenty five percent (25%) of Client's then unpaid Acceptable Accounts purchased by Durham.

Initials: _____                                                                                      4

4.10. Non-Recourse: Client shall offer for sale to Durham certain Accounts. The Acceptable Accounts which Durham chooses to purchase, at its sole discretion, shall be listed from time to time on a Schedule of Accounts. Upon purchase, Durham will assume the risk of non-payment on Purchased Accounts, so long as the cause of non-payment is solely due to the occurrence of an account debtor's financial inability to pay, an "Insolvency Event". It shall be presumed that such non-payment is caused by reasons other than its financial inability to pay.

4.11. Disputed Accounts: Client will immediately notify Durham and accept back (repurchase) from Durham any Purchased Account subject to a dispute between Customer and Client of any kind whatsoever.

4.12. Hold in Trust: Client will hold in trust and safekeeping, as the property of Durham, and immediately turn over to Durham the identical check or other form of payment received by Client, whenever any payment on any Purchased Account comes into Client's possession; any failure by Client in this regard constitutes a default under this Agreement. The Client shall immediately pay Durham a Misdirected Payment Fee of 15% of the face amount of each payment not paid to Durham in accordance with this Section.

4.13. Responsibility for Taxes: All taxes and governmental charges with respect to goods or services represented by Accounts purchased by Durham shall be the obligation and responsibility of Client. Client has no obligation for Durham's income or property taxes or any other taxes with respect to Durham's business.

4.14. Notice of Levy: Client will promptly notify Durham of any material attachment, tax assessment or other legal process levied against Client or any of Client's Customers.

4.15. Book Entry: Client will, immediately upon sale of Accounts to Durham, make proper entries on its books and records disclosing the absolute sale of said Accounts to Durham subject to the terms and conditions of this Agreement.

4.16. Legal Fees: Except as is prohibited by law, Client shall pay to Durham all reasonable costs and expenses, including without limitation attorney's fees and expenses, and costs incurred by Durham in the prosecution or enforcement of any of Durham's rights, claims or courses of action which arise out of, relate to or pertain to this Agreement.

4.17. Power of Attorney: Client hereby names, appoints, and constitutes Durham and its designees as Client's true and lawful attorney-in-fact, and does hereby request, authorize empower and direct Durham or its designee, for and in the name and instead of Client, either in Client's name or Durham's name to:

   4.17.1. compromise, adjust or settle any claim of a Customer with respect to an Purchased Account;

   4.17.2. extend the time of payment of compromise or settle for cash, credit, return of merchandise, and upon any terms or conditions, any and all Purchased Accounts or other Collateral which includes a monetary obligation and discharge or release any account debtor or other obligor (including filing of any public record releasing any lien granted to Client by such account debtor), without affecting any of the Obligations;

   4.17.3. execute in the name of the Client and file against Client in favor of Durham financing statements or amendments with respect to Collateral;

   4.17.4. pay any sums necessary to discharge any lien or encumbrance effecting Durham's security interest in the Collateral, which sums shall be included as Obligations hereunder;

   4.17.5. demand, sue for, collect and give release for any and all monies due or to become due on Accounts;

   4.17.6. make any and all corrections or completions on any of the invoices or other documents constituting the Purchased Accounts;

Initials: _____

4.17.7. communicate directly with Client's customers (Account Debtors) to verify the amount, viability or status of any Purchased Account, or Account offered to Durham for purchase, or to obtain or transmit any information Durham deems necessary in its sole discretion;

4.17.8. endorse Client's name an any checks, drafts, instruments or other evidences of payment with respect to any Purchased Account or to otherwise collect the same;

4.17.9. receive, open and dispose of all mail addressed to Client with respect to any Purchased Account; and

4.17.10. do all other acts and things necessary to carry out the purpose and intent of this Agreement. All acts of Durham as attorney-in-fact are hereby ratified and approved and Durham shall not be liable for any errors of commission or omission nor for any error of or mistake of law or fact excepting acts constituting gross negligence or willful misconduct. This power of attorney is coupled with an interest and is irrevocable for so long as Client is indebted to Durham. The authority granted Durham shall remain in full force and effect until all Purchased Accounts are paid in full and any indebtedness of Client to Durham is discharged.

4.18. ~~ACH Authorization: in order to satisfy any of the obligations to Durham under this Agreement, Client hereby authorizes Durham to initiate electronic debit or credit entries through the Automated Clearing House system to any bank account maintained by Client wherever located.~~

4.19. **JURY TRIAL WAIVER - IN RECOGNITION OF THE HIGHER COSTS AND DELAY WHICH MAY RESULT FROM A JURY TRIAL, THE PARTIES HERETO WAIVE ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING HEREUNDER, OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT HERETO, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY FURTHER WAIVES ANY RIGHT TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT ANY PARTY HERETO MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.**

4.20. Indemnification: Client agrees to indemnify Durham against and save Durham harmless from any and all manner of suits, claims, liabilities, demands and expenses (including reasonable attorneys' fees and collection costs) resulting from or arising out of this Agreement, whether directly or indirectly, including the transactions or relationships contemplated hereby (including the enforcement of this Agreement), and any failure by Client to perform or observe its obligations under this Agreement.

5. **DEFAULT**

5.1. Events of Default: Any one or more of the following shall be a default hereunder:

5.1.1. Client or Guarantor's breach of any promise, covenant or warranty under this Agreement or any other Agreements between Client or Guarantor and Durham or obligation of Client to Durham, including without limitation, payment of any obligations to Durham when due, or absent an Insolvency Event the failure of any account debtor to pay within 90 days after date of invoice;

5.1.2. the appointment of any receiver or trustee of all or a substantial portion of the assets of Client; insolvency or inability to pay debts as they mature; a general assignment for the

Initials: _____

6

benefit of creditors; the voluntary or involuntary filing of a petition for relief under any bankruptcy or similar law;

5.1.3. issuance of any levies of attachment, executions, tax assessments or similar process against the Collateral; and/or

5.1.4. Client's tender to Durham of information that is false or incorrect in any material respect, or Durham deems itself insecure with respect to Client's performance of its obligations.

5.2. Remedies After Default: In the event of any default, Durham may take or do any one or more of the following:

5.2.1. declare any obligations including outstanding Purchased Accounts purchased by Durham, immediately due and payable;

5.2.2. require Client to send copies of records and files pertaining to Accounts to Durham and, with reasonable notice, enter the premises of Client to make copies of the Collateral and the records pertaining to the Accounts and any other Collateral; and

5.2.3. hold Client liable for any deficiency;

5.2.4. offset any obligations owing to Durham against any of Client's property held by Durham;

5.2.5. change the address for delivery of mail to Client and to receive and open any mail addressed to Client, solely with respect to Purchased Accounts.

## 6. MISCELLANEOUS

6.1. Post-Termination: After termination Client shall be liable to Durham for the full and prompt payment of the full amount of Purchased Accounts ~~which have been sold and assigned to Durham~~ and are then outstanding and unpaid, disputed or undisputed, as well as any other indebtedness whatsoever. Durham shall continue to have a security interest in the Collateral of Client until any existing obligations of Client to Durham are paid in full.

6.2. Upon termination of this Agreement Durham may retain the Reserve Account:

6.2.1. For ninety days thereafter to be applied to payment of any Obligations that were unknown to Durham at the time of termination, and

6.2.2. Unless and until Client has executed and delivered to Durham a general release.

6.3. Exposed Payments.

6.3.1. Upon termination of this Agreement Client shall pay to Durham (or Durham may retain), to hold in a non-segregated non-interest bearing account the amount of all Exposed Payments (the "Preference Reserve").

6.3.2. Durham may charge the Preference Reserve with the amount of any Exposed Payments which Durham pays to the bankruptcy estate of the Account Debtor which made Exposed Payment, on account of a claim asserted under Section 547 of the Bankruptcy Code.

6.3.3. Durham shall refund to Client from time to time that balance of the Preference Reserve for which claim under Section 547 of the Bankruptcy Code can no longer be asserted due to the passage of the statute of limitations, settlement with the bankruptcy estate of the Account Debtor or otherwise.

6.4. Repurchase Of Accounts. Purchaser may require that Seller repurchase, by payment of the then unpaid Face Amount thereof together with any unpaid fees relating to the Purchased Account on demand or, at Durham's option by Durham's charge to the Reserve Amount.

6.4.1. Notwithstanding the occurrence of an Insolvency Event:

6.4.1.1. Any Purchased Account, the payment of which has been disputed by the Account Debtor obligated thereon, Durham being under no obligation to determine the bona fides of such dispute;

6.4.1.2. All Purchased Accounts upon the occurrence of an Event of Default, or upon the termination date of this Agreement; and

Initials: _____

7

6.4.1.3. If an Insolvency Event had not occurred prior to 90 days after the due date on the Account ("Late Payment Date"), any Purchased Account which remains unpaid beyond such Late Payment Date.

6.5. Applicable Law: This Agreement shall be governed by and construed in accordance with laws of the State of New York and shall be binding upon the successors, assigns and representatives of the parties hereto. Client and Durham hereby agree that any suit, action, or proceeding arising out the subject matter hereof, or the interpretation, performance or breach of this Agreement shall be instituted in the Courts of New York located in Rochester, Monroe County (hereinafter, "The New York Court"). Client and Durham hereby agree that The New York Court is convenient to each party hereto and Client and Durham irrevocably submit to such jurisdiction, irrevocably agree to be bound by any judgment rendered thereby in connection with this Agreement, and forever waive any and all objections to jurisdiction or venue that each party may have under the laws of the State of New York or otherwise in those courts in any such suit, action or proceeding. If any such proceeding is initiated in any other jurisdiction, Client hereby waives any right to oppose any motion or application made by Durham as a consequence of such proceeding having been commenced in a jurisdiction other than The New York Court.

6.6. Entire Agreement-Amendment: This document contains the entire Agreement between the parties as of the date specified below. This Agreement may be modified only by a written instrument executed by the parties hereto.

Executed and accepted this _____ day of July, 2012.

**CLIENT: Dryden Advisory Group, LLC:**     **Durham Commercial Capital Corp.:**

By: _____     By: _____

Name:  John Ridley     Name: Timothy Mura

Title: _____     Title: Treasurer

Date: _____     Date: _____

**IN WITNESS WHEREOF**, the undersigned have executed this Agreement this ____ day of July, 2012.

BY: _____     Date _____
    John Ridley

STATE OF _____: COUNTY OF _____     ss:

On this _____ day of July, 2012, before me the undersigned, a Notary Public in and for said State, personally appeared John Ridley, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument; and he/she acknowledged to me that he/she executed the same in his/her capacity and that by his/her signature on the instrument, the individual, or the person upon the behalf of which the individual acted, executed the instrument.

_____
Notary Public

Initials: _____     8

# EXHIBIT E

Office: (610) 228-4654
Fax: (484) 485-2757
Direct: (215) 901-9698
Email: Dpuyear@InnovFS.net
Website: www.innovativefinancingsolutions.net

Begin forwarded message:

> **From:** "Scott DiBerardinis" <sdiberardinis@durhamcommercialcapital.com>
> **Date:** July 23, 2012 4:18:06 PM EDT
> **To:** "'David Puyear'" <dpuyear@innovfs.net>
> **Subject: RE: RE: Beneficial**
>
> Please have beneficial confirm in an email that all is good.
>
> Cheers,
>
> **From:** Scott DiBerardinis [mailto:sdiberardinis@durhamcommercialcapital.com]
> **Sent:** Monday, July 23, 2012 2:08 PM
> **To:** 'David Puyear'
> **Subject:** RE: Beneficial
>
> Dave ,
>
> Our signed copy of agreement for bank, can you forward over to them.
>
> Cheers,
>
> Scott

# EXHIBIT F

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Terri Carr          (215) 390-1021

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

⌜ Starfield & Smith, P.C.
   1300 Virginia Drive
   Suite 325
   Fort Washington, PA 19034

   tcarr@starfieldsmith.com ⌟

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is |
|---|---|
| 2011072703835   7/26/2011 | to be filed [for record] (or recorded) in the ☐ REAL ESTATE RECORDS. |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial) Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor **or** ☐ Secured Party of record. Check only **one** of these two boxes.

Also check **one** of the following three boxes **and** provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Dryden Advisory Group, LLC | | | |

OR

| 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only **one** box.

Describe collateral ☒ deleted **or** ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

The Accounts and proceeds thereof derived solely from: (i) that certain invoice #3209 issued by Debtor to Fiserv. Cir. Inc., dated June 22, 2012, and (ii) that certain invoice #3210 issued by Debtor to Fiserv. Circ. Inc., dated June 22, 2012

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Beneficial Mutual Savings Bank | | | |

OR

| 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 10. OPTIONAL FILER REFERENCE DATA | F# 353538 |
|---|---|
| Filed with: PA - Secretary of the Commonwealth; Debtor: DRYDEN ADVISORY GROUP, LLC Client# 2378-000 | A# 512568 |

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Terri Carr                    (215) 542-7070

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

```
Starfield & Smith, P.C.
1300 Virginia Drive
Suite 325
Fort Washington, PA  19034

tcarr@starfieldsmith.com
```

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. This FINANCING STATEMENT AMENDMENT is |
|---|---|
| 2011072703847  07/26/2011 | ☐ to be filed [for record] (or recorded) in the REAL ESTATE RECORDS. |

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ ASSIGNMENT (full or partial): Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. AMENDMENT (PARTY INFORMATION): This Amendment affects ☐ Debtor or ☐ Secured Party of record. Check only one of these two boxes.
Also check one of the following three boxes and provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.    ☐ DELETE name: Give record name to be deleted in item 6a or 6b.    ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Dryden Advisory Group, LLC | | | |

| OR | 6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

| OR | 7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. AMENDMENT (COLLATERAL CHANGE): check only one box.

Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

The Accounts and proceeds thereof derived solely from: (i) that certain invoice #3209 issued by Debtor to Fiserv Cir. Inc., dated June 22, 2012, and (ii) that certain invoice #3210 issued by Debtor to Fiserv. Circ. Inc., dated June 22, 2012

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Beneficial Mutual Savings Bank | | | |

| OR | 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|---|
| | | | | |

| 10. OPTIONAL FILER REFERENCE DATA | F#353541 |
|---|---|
| Filed with: PA - Secretary of the Commonwealth; Debtor: Dryden Advisory Group, LLC Client# 2378-000 | A#512573 |

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

## UCC FINANCING STATEMENT **AMENDMENT**

FOLLOW INSTRUCTIONS (front and back) CAREFULLY

A. NAME & PHONE OF CONTACT AT FILER [optional]
Terri Carr                    (215) 542-7070

B. SEND ACKNOWLEDGMENT TO: (Name and Address)

Starfield & Smith, P.C.
1300 Virginia Drive
Suite 325
Fort Washington, PA 19034

tcarr@starfieldsmith.com

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

| 1a. INITIAL FINANCING STATEMENT FILE # | 1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] [or recorded] in the REAL ESTATE RECORDS. |
|---|---|
| 2011072703859  07/26/2011 | |

2. ☐ **TERMINATION:** Effectiveness of the Financing Statement identified above is terminated with respect to security interest(s) of the Secured Party authorizing this Termination Statement.

3. ☐ **CONTINUATION:** Effectiveness of the Financing Statement identified above with respect to security interest(s) of the Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law.

4. ☐ **ASSIGNMENT** (full or partial) Give name of assignee in item 7a or 7b and address of assignee in item 7c; and also give name of assignor in item 9.

5. **AMENDMENT (PARTY INFORMATION):** This Amendment affects ☐ Debtor *or* ☐ Secured Party of record. Check only *one* of these two boxes.
Also check *one* of the following three boxes *and* provide appropriate information in items 6 and/or 7.

☐ CHANGE name and/or address: Please refer to the detailed instructions in regards to changing the name/address of a party.  ☐ DELETE name: Give record name to be deleted in item 6a or 6b.  ☐ ADD name: Complete item 7a or 7b, and also item 7c; also complete items 7e-7g (if applicable).

6. CURRENT RECORD INFORMATION:

| 6a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Dryden Advisory Group, LLC | | | |
| OR  6b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

7. CHANGED (NEW) OR ADDED INFORMATION:

| 7a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR  7b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| | | | | |
| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| | | | | |

| 7d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 7e. TYPE OF ORGANIZATION | 7f. JURISDICTION OF ORGANIZATION | 7g. ORGANIZATIONAL ID #, if any |
|---|---|---|---|---|
| | | | | ☐ NONE |

8. **AMENDMENT (COLLATERAL CHANGE):** check only *one* box.
Describe collateral ☒ deleted or ☐ added, or give entire ☐ restated collateral description, or describe collateral ☐ assigned.

The Accounts and proceeds thereof derived solely from: (i) that certain invoice #3209 issued by Debtor to Fiserv Cir. Inc., dated June 22, 2012, and (ii) that certain invoice #3210 issued by Debtor to Fiserv. Circ. Inc., dated June 22, 2012

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT (name of assignor, if this is an Assignment). If this is an Amendment authorized by a Debtor which adds collateral or adds the authorizing Debtor, or if this is a Termination authorized by a Debtor, check here ☐ and enter name of DEBTOR authorizing this Amendment.

| 9a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Beneficial Mutual Savings Bank | | | |
| OR  9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
| | | | |

| 10. OPTIONAL FILER REFERENCE DATA | |
|---|---|
| Filed with: PA - Secretary of the Commonwealth; Debtor: Dryden Advisory Group, LLC Client# 2378-000 | F#353542 A#512574 |

FILING OFFICE COPY — UCC FINANCING STATEMENT AMENDMENT (FORM UCC3) (REV. 05/22/02)

# Account Purchase Addendum v1 3

This Addendum is entered into this 25th day of July, 2012 by and between Dryden Advisoty Group LLC, (the 'Seller') and Durham Commercial Capital Corp (the 'Purchaser'), and is made a part and supplements that certain Master Account Receivable Purchase Agreement (the 'Agreement') between Seller and Purchaser dated July 6, 2012.

In Consideration of the total purchase price set forth below, Seller hereby sells and assigns to Purchaser the following described accounts receivable due from:

| Account Debtor | Store | Invoice Number | Invoice Date: | Invoice Amount: | Reserve Amount | Trans Fee | Advance Amount: |
|---|---|---|---|---|---|---|---|
| Fiserv Cir. Inc 912 Fort Duquesne Blvd Pittsburgh, PA 15222- | | | | | | | |
| | | 3209 | 6/22/2012 | $250,000.00 | $62,500.00 | $0.00 | $187,500.00 |
| | | 3210 | 6/22/2012 | $59,165.82 | $14,791.45 | $0.00 | $44,374.37 |
| | | | | | | | $231,874.37 |
| | | | Totals: | $309,165.82 | $77,291.45 | $0.00 | $231,874.37 |
| | | | | | Other Charges | | ($525.00) |
| | | | | | Net Check | | $231,349.37 |

## Other Charges

| Date | Description | | Amount |
|---|---|---|---|
| 7/25/2012 | Wire Transfer Fee | | $25.00 |
| 7/25/2012 | Due Diligence Fee | | $500.00 |
| Durham Commercial Capital Corp | | Check # | |

Seller: Advisory SB
Dryden Advisoly Group LLC

_John Ridley_
John Ridley
President

Purchaser:
Durham Commercial Capital Corp

Timothy Mura
Fax #: 585-218-9033

Advance Number 2144

Case 1:15-bk-00545-MDF    Doc 43-1    Filed 03/02/15    Entered 03/02/15 11:44:29    Desc Exhibit    Page 61 of 63



# Invoice

| DATE | INVOICE # |
|------|-----------|
| 6/22/2012 | 3209 |

**BILL TO**

Fiserv Cir. Inc.
Attn: Mr. Scott LaRue
Finance Manager
912 Fort Duquesne Boulevard
Pittsburgh, PA 15222-3602

**REMIT TO**

Dryden Advisory Group, LLC
4811 Jonestown Road
Suite 220
Harrisburg, PA 17109

1.5% Late Fee Assessed Per Month On
Accounts Overdue

| TERMS | DUE DATE | REP |
|-------|----------|-----|
| Net 30 | 7/22/2012 | ME |

| DESCRIPTION | CALCULATIONS | AMOUNT DUE |
|-------------|--------------|------------|
| Consulting Services Rendered in Filing a Sales and Use Tax Refund to the Pennsylvania Commonwealth Court Docket Numbers 330 FR 2011, 331 FR 2011, & 332 FR 2011 | | 250,000.00 |

Please use Dryden's Federal Express Account (2217-5407-7) to send payment overnight for next day delivery. Thank you.

Please remit to above address.

**Invoice Total**   $250,000.00



# Invoice

| DATE | INVOICE # |
|------|-----------|
| 6/22/2012 | 3210 |

**BILL TO**

Fiserv Cir. Inc.
Attn: Mr. Scott LaRue
Finance Manager
912 Fort Duquesne Boulevard
Pittsburgh, PA 15222-3602

**REMIT TO**

Dryden Advisory Group, LLC
4811 Jonestown Road
Suite 220
Harrisburg, PA 17109

1.5% Late Fee Assessed Per Month On Accounts Overdue

| TERMS | DUE DATE | REP |
|-------|----------|-----|
| Net 30 | 7/22/2012 | ME |

| DESCRIPTION | CALCULATIONS | AMOUNT DUE |
|-------------|--------------|------------|
| Consulting Services Rendered in Filing a Sales and Use Tax Refund to the Commonwealth Court of PA Under Docket Numbers 798 FR 2011 & 23 FR 2012 | | 59,165.82 |
| | | |
| Gross Commonwealth Court Refund Amount: | $131,479.59 | |
| Less Legal Fees from William C. Felker: | <$13,147.96> | |
| | | |
| Net Commonwealth Court Refund: | $118,331.63 | |
| Contingency Fee Amount: | x 50% | |
| | | |
| Amount Due Dryden Advisory Group, LLC: | $59,165.82 | |

Please use Dryden's Federal Express Account (2217-5407-7) to send payment overnight for next day delivery. Thank you.

| Please remit to above address. | **Invoice Total** | $59,165.82 |
|---|---|---|