**UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | * | **CHAPTER 11** |
| **DRYDEN ADVISORY GROUP, LLC** | * | |
|     **Debtor-in-Possession** | * | |
| | * | **CASE NO. 1:15-bk-00545MDF** |
| **DRYDEN ADVISORY GROUP, LLC,** | * | |
|     **Movant** | * | |
| | * | |
|     **v.** | * | |
| | * | |
| **BENEFICIAL MUTUAL SAVINGS** | * | |
| **BANK, CITIBANK, N.A. and DURHAM** | * | |
| **COMMERCIAL CAPITAL CORP.,** | * | |
|     **Respondents** | * | |

## OPINION

Before the Court is the objection of Durham Commercial Capital Corp. ("Durham") to

the motion filed by Dryden Advisory Group, LLC ("Dryden"), the debtor in the within case, for

an order approving Dryden's use of cash collateral. Durham opposes Dryden's motion as it

pertains to certain accounts receivable Durham asserts it purchased under a factoring agreement

entered into between the parties before Dryden filed its bankruptcy petition. If Durham is correct,

the accounts it purchased are not property of Dryden's bankruptcy estate.

Dryden counters that the agreement with Durham, while described as a sale, should be

recharacterized as a financing agreement with the accounts receivable serving as collateral for

certain extensions of credit made by Durham. Under the latter scenario, the accounts would

remain property of the estate.

Beneficial Mutual Savings Bank ("Beneficial"), setting aside the issue of whether the

agreement reflects a true sale or a secured financing arrangement, argues that any interest

Durham purports to hold is subordinate to Beneficial's security interest in Dryden's accounts

receivable. Beneficial asserts that it only agreed to release its lien on two accounts receivables from Dryden's account debtor, Fiserv Cir., Inc. ("Fiserv"). Citibank, N.A. ("Citibank") also takes no position on whether the disputed accounts are property of the estate. Rather, Citibank asserts that it has a first lien in accounts receivable and that it did not consent to the release of its lien in connection with the purported sale of accounts.

For the reasons set forth below, Durham's objections to Dryden's use of cash collateral will be sustained. Because the disputed accounts are not property of the estate, the Court also finds that it lacks subject matter jurisdiction under 28 U.S.C. § 1334(b) to determine the respective interests of Beneficial, Citibank, and Durham in the disputed accounts.[1]

## I. BACKGROUND

Dryden is a sales and use tax consulting firm established by John Ridley ("Ridley") in 1997. Before starting the consulting business, Ridley worked for twenty years as a tax auditor for the Pennsylvania Department of Revenue. In the process of auditing tax returns, Ridley observed that taxpayers not only underpaid taxes, they often overpaid them. Ridley formed Dryden to assist clients in defending tax audits and in identifying refunds or credits against assessed taxes. Dryden obtains commissions based upon the amount of tax savings it obtains for its clients.

While pursuing claims through the administrative and judicial appeals process, a process that can extend for years, Dryden often experienced cash flow problems. During one of these periods, Dryden contacted a consultant, Innovative Financing Solutions ("IFS"), for assistance in

---

[1]The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is core pursuant to 28 U.S.C. § 157(b)(2)(A),(B), and (O). This Opinion constitutes findings of fact and conclusions of law made under Fed. R. Bankr. P. 7052, which is applicable to contested matters pursuant to Fed. R. Bank. P. 9014.

2

obtaining additional financing. IFS suggested that Dryden apply for financing through the U.S.

Small Business Administration (the "SBA"). One of IFS's partners for SBA financing was

Beneficial, which agreed to make several loans to Dryden.

In July 2011, Beneficial and Dryden entered into three loan agreements (collectively, the

"Beneficial Loans"). Two of the loans, each in the original principal amount of $1,360,200, were

guaranteed by the SBA. The third loan, which was not guaranteed by the SBA, was a revolving

credit agreement in the amount of $300,000. The Beneficial Loans were secured by perfected

liens on Dryden's business assets, including its accounts receivable. At about the same time,

Citibank, which held existing liens on Dryden's assets, and Beneficial entered into an

"Intercreditor and Subordination Agreement" whereby Citibank agreed to subordinate its existing

lien position to Beneficial in exchange for a partial payment of the outstanding indebtedness

owed to Citibank and other consideration.

Less than a year after receiving the Beneficial Loans Dryden stopped making the required

payments and contacted IFS to recommend possible workout solutions. IFS suggested to

Beneficial that Dryden could monetize its accounts receivable through factoring and further

advised the bank that under SBA guidelines, Beneficial could consent to the factoring of one

Dryden account without obtaining approval from the SBA. Beneficial approved the factoring of

the Fiserv accounts, comprising two invoices in a total amount of $310,000. IFS served as the

liaison between Beneficial, Durham, and Dryden while the factoring agreement was being

negotiated.

On July 12, 2012, Dryden and Durham executed a "Nonrecourse Receivables Purchase

Contract and Security Agreement" (the "Factoring Agreement"). The first version of the

3

Factoring Agreement (Durham Ex. 1) was signed by the Durham and Dryden without the prior approval of Beneficial. When Beneficial became aware of the agreement, it insisted on certain changes to protect its interests. A final version of the Factoring Agreement, including the changes demanded by Beneficial (the "Amended Factoring Agreement"), was signed by Ridley on July 23, 2013.[2] *See* Durham Ex. 3. After the changes required by Beneficial were made to the agreement, the Fiserv accounts were transferred to Durham.

The stated purpose of the Amended Factoring Agreement was to "obtain a true nonrecourse sale of [Dryden's] accounts receivable to Durham." Durham Ex. 3 §1. Although Dryden entered into the agreement because it was unable to make its payments to Beneficial, Dryden warranted that its business was "solvent," and that it was "presently paying its debts as they became due." Durham Ex. 3 §3.1.

Under the Amended Factoring Agreement, Dryden would offer to Durham an account for purchase using Durham's "Assignment Schedule of Invoices" together with the original invoice and all supporting documents. Durham Ex. 3 §4.5. If Durham determined that a particular account receivable was an "acceptable account," Durham would purchase the account for the face amount less discounts or allowances afforded to the account debtor. Durham. Ex. 3 §4.6. For each account purchased, Durham would charge a factoring fee of 3.5% of the original face

---

[2]The copy of the Amended Factoring Agreement incorporating Beneficial's amendments admitted into evidence in this proceeding was not executed by Durham. Durham did not dispute, and, in fact, affirmatively asserted that the Amended Factoring Agreement governed the relationship between Dryden and Durham.

amount of the account.[3] An additional 1.75% would be charged as a fee beginning thirty days after the account was purchased for each 15-day period until Durham received the full face amount of the invoice either from Dryden or the account debtor. Durham Ex. 3 §4.7.1. Dryden was also responsible for any costs incurred by Durham, including bank fees, lien search fees, and lien recording fees. Durham Ex. 3 §4.7.3.

To insure that its fee was paid pending collection of the invoice, the Amended Factoring Agreement also provided that Durham would reserve 25% of the face amount of each account purchased against which Durham's fees would be charged. Once Durham received payment on the account, the remaining amount in reserve associated with the account would be paid to Dryden. However, Durham had the option to retain the reserve if there was a default on any account purchased or there was less than 25% of the unpaid balance on the reserve held for any account purchased. Durham Ex. 3 §4.9. Durham agreed to assume the risk of non-payment on accounts it purchased if the cause of the non-payment was "solely due to the occurrence of an account debtor's financial inability to pay, an 'Insolvency Event.'" Durham Ex. 3 §4.10. The maximum amount Durham agreed to advance to Dryden under the Amended Factoring Agreement was $350,000. Durham Ex. 3 §2.9.

The changes to the original Factoring Agreement demanded by Beneficial required Durham and Dryden to acknowledge Beneficial's interest in accounts receivable. *See* Durham Ex. 2. Dryden agreed to provide Durham with a security interest in its tangible and intangible personal property, but as required by Beneficial, Durham acknowledged that its interest in

---

[3]By purchasing the invoices at the face amount less discounts for a fee of 3.5%, Durham was in effect purchasing the account at 96.5% of its value. If the invoice was not paid in full within 30 days, the purchase price would be further "discounted" by the month fee.

5

Dryden's property was subject to Beneficial's senior lien.[4] Durham Ex. 3, §§4.1, 4.3. Further,

Dryden was barred from offering to sell any account to Durham without "Beneficial's prior

written consent to release its Senior Lien on such Account . . . ." Durham Ex. 3 §3.2.[5] If Dryden

received payment directly on any purchased account, it agreed to surrender the payment to

Durham on the next business day, and if it failed to do so, it would pay Durham a "Misdirected

Payment Fee" of 15% of the face amount of each payment not held in trust for Durham. Durham

Ex. 3 §§2.10, 4.12. In connection with the changes required by Beneficial to the Factoring

Agreement, Durham and Beneficial executed a separate one-paragraph acknowledgment stating

that:

> Durham can purchase certain accounts receivable from [Dryden] pursuant to a
> [Factoring Agreement] which Bank has reviewed and commented upon prior to
> the agreement ( the "Purchased Accounts"). Bank acknowledges and agrees to
> release the Purchased Accounts from its security interest, and acknowledges its
> consent to Durham placing a subordinate lien on the [Dryden's] assets. Bank
> further agrees that it will not interfere with Durham's efforts to collect the
> Purchased Accounts.

Durham Ex. 5.

Beneficial and Durham dispute the meaning of this acknowledgment. Durham asserts that

it constitutes a general subordination agreement whereby Beneficial authorized Durham to

---

[4]The Amended Factoring Agreement did not address Citibank's lien on Dryden's
accounts receivable. At the hearing Durham adopted the position that Beneficial had agreed to
subordinate its lien for certain accounts to be factored. Hence, because Citibank was
subordinated to Beneficial, Citibank was subordinated to Durham.

[5]Despite this provision, Durham's President, Craig McGrain, testified that he would not
have entered into a contract that required the consent of the first lienholder before its collateral
could be sold because "we would never know whether the bank has consented, not consented,
withdrawn its consent so we wouldn't enter into an agreement which required the bank's prior
written consent to us purchasing a receivable." N.T. 120, April 28, 2015.

6

purchase any accounts it found acceptable from Dryden free and clear of Beneficial's lien. Beneficial argues that the only accounts it agreed to release were the Fiserv accounts and that it could not agree to the release of other accounts without prior approval of the SBA.

While Beneficial interpreted the Amended Factoring Agreement narrowly, Dryden and Durham interpreted it broadly. At Dryden's request, Durham factored numerous additional accounts for Dryden. For its part, although the Amended Factoring Agreement specified that "[Dryden] shall not offer to Durham any Account for purchase, without Beneficial's prior written consent to release its Senior Lien on such Account," Dryden did not request Beneficial to release its lien on additional invoices after the Fiserv invoices were factored. When questioned about whether prior consent was obtained to factor additional invoices, Ridley stated: "I just signed the agreement with Durham and figured that – I was never privy to [Durham's] agreement with Beneficial in the beginning and I just figured they had it taken care of and I suppled [Durham] invoices and they advanced me funds." N.T. 46, May 7, 2015.

It is unclear from the record exactly when additional invoices subject to Beneficial's lien were first factored. At least as early as November 2013, Dryden contacted Durham about factoring a receivable for Dryden's client, Janney Montgomery Scott ("Janney"). On November 1, 2013, Michael Eismann ("Eismann"), Dryden's Vice-President of Sales and Marketing, requested Durham to factor Dryden's anticipated fee of $114,450 on the Janney invoice. Debtor Ex. 5. Apparently in recognition of the $350,000 limit specified in the Amended Factoring Agreement, Eismann asked whether Dryden had "room to factor the whole thing." *Id.* Scott DiBerardinis ("DiBerardinis"), Dryden's immediate contact at Durham, responded, "We went through and raised your credit line to $500,000. That should give you some room to work with

7

for any additional invoices." *Id*. On November 4, 2012, Dryden executed and delivered to Durham an "account purchase addendum" for the Janney invoice. Beneficial was not contacted by either Dryden or Durham about releasing its lien before the account was factored.

Although the Amended Factoring Agreement does not specify how Dryden's factored accounts would be collected, a practice developed whereby once a final determination was made as to a client's tax liability, a check would be made out to the client and sent to William Felker ("Felker"), the attorney who handled tax appeals for Dryden. Felker would then send the check to Dryden to forward to the client with a bill for services. If the client received an offset against its tax liability rather than a refund, Dryden would simply notify the client of the result and enclose its invoice for services. For accounts factored with Durham, Dryden would sell the invoice to Durham attached to a purchase addendum. Durham would then pay Dryden 75% of the invoice and retain 25% in reserve. The invoice would direct the client, in most cases, to remit payment of Dryden's fee to Felker. Dryden's clients responded in a variety of ways. Some remitted the fees to Dryden, others to Felker. The funds were then sent by either Dryden or Felker to Durham.

In December 2013 and January 2014, Dryden and Durham executed additional account purchase addenda for invoices from Dryden's account debtors. During this same period there were regular email exchanges between DiBerardinis and Eismann regarding the time frame in which the invoices were being paid. In response to numerous frantic emails from DiBerardinis to Eismann about delays in the payment of the Mountainview Thoroughbred ("Mountainview") and Susquehanna Bank ("Susquehanna") invoices, Eismann described the status of various accounts. He stated that Dryden expected to receive payment of the Mountainview invoice between January 23 and February 1 and that the Verizon invoice was due February 14. Although the

8

Janney account had been transferred to Durham in November, Eismann reported that there were credits of more than $1 million to review and that Dryden could not get the auditor to finalize her work papers. He also reported that Dryden expected to receive the Susquehanna account "any day." Durham's representative, Tim Mura ("Mura"), responded and thanked Eismann for the update, but also requested new invoices be submitted to "off set the ones we have for Mountainview, Susquehanna and Janney." Debtor Ex. 5. In response, Dryden submitted five additional invoices to substitute for the funds advanced on other invoices, but not yet received from the account debtors. Durham did not advance additional funds to Dryden on the substituted invoices or immediately release the original invoices.[6]

In late January 2014, Dryden received payment on the Mountainview invoice and wired $126,00 of the funds received to Durham, which reflected the amount advanced to Dryden on the invoice. DiBerardinis contacted Dryden to demand that the full amount of the invoice ($189,000) be sent to Durham so that the funds received would match the amount of the invoice purchased. DiBerardinis promised that Durham would rebate the funds not advanced by Durham. Mura directed Dryden to wire the balance of the invoice immediately because there was still $22,569.90 outstanding over ninety days attributable to other factored accounts.

On February 6, 2014, Mura sent Dryden rebate documents for the Mountainview invoice, the rebate statement for the Susquehanna invoice, and the account purchase addendum for the

---

[6]Although the factoring process as described by the witnesses implied that tax credits and refunds had been finally determined by the Commonwealth and that the account debtor was being billed contemporaneously with the sale of the account to Durham, this was not always the case. As revealed in the numerous emails between Durham and Dryden, at times invoices were sold to Durham before an account debtor's tax appeal was finalized and before payment from the account debtor could be demanded considering the contingent nature of Dryden's compensation arrangements.

five invoices submitted to replace the Susquehanna invoice. He further notified Dryden that because on several occasions invoices were paid directly to Dryden and not to Felker, all of Dryden's customers were put on notice to remit payments directly to Durham.

Unaware that Dryden had factored numerous accounts in addition to the Fiserv accounts, Beneficial discovered the additional activity when it performed a site audit in May 2014. Beneficial responded by demanding that Durham cease and desist from further factoring of its collateral and return any funds collected from Dryden's assets. In response, Durham asserted that Beneficial had authorized the factoring of Dryden's accounts.

Dryden filed its bankruptcy petition on February 13, 2015, and on February 20, 2015 filed a motion seeking an interim order for the use of cash collateral. Beneficial objected to the motion, but the objection was ultimately resolved by the parties through stipulation. After the interim cash collateral order was entered on February 24, 2015, Durham requested reconsideration of the order asserting that some of the accounts receivable included in the cash collateral order had been purchased by Durham more than a year before the bankruptcy filing. Beneficial and Dryden objected to the motion for reconsideration, which was denied by the Court. However, the Court reserved for final decision the issue of whether the factored accounts were property of the bankruptcy estate.

At the continued hearing on Dryden's use of cash collateral held on April 28, 2015, Debtor's counsel represented that while Durham had asserted rights in six outstanding invoices on the date the petition was filed, four of the invoices had been collected before the bankruptcy filing. Counsel initially stated that only a Verizon invoice of $117,400 and a partial payment on a Janney invoice of $71,000 remained uncollected on the petition date. The Janney invoice was

10

collected by Dryden post-petition. Counsel later amended this representation to also include in Durham's claim an invoice of $28,558.89 for fees related to DST Health Solution Services.

An evidentiary hearing was held on April 28, 2015 and on May 7, 2015 on the issues of whether Dryden should be permitted to continue to use cash collateral and also on the issue of whether any of the accounts receivable asserted to be estate property had been sold to Durham before Dryden filed its bankruptcy petition. With Beneficial's objection having been resolved, the only issue to be addressed by the Court is whether the disputed accounts are property of the bankruptcy estate.

## II. DISCUSSION

The issue before the Court is whether the Amended Factoring Agreement is a sale of Dryden's accounts receivable (a true sale) or whether it constitutes an extension of credit with accounts receivable as collateral (a loan). This issue is significant because if certain accounts were sold to Durham pre-petition, those accounts are not property of the bankruptcy estate. If the accounts are not property of the estate, this court lacks jurisdiction to determine the priority of interests in the accounts among Durham, Beneficial, and Citibank.

### A. *Factoring of accounts receivable – "true sale" or financing?*

A business with outstanding payables may decide that it needs cash immediately. One solution to this liquidity problem is to sell receivables at some discounted price, another is to use the receivables to collateralize a loan. If the transaction is a "sale," then title passes to the purchaser. If the transaction creates a security interest in favor of the lender, the business remains the owner of the receivables subject to the lender's interest.

Case 1:15-bk-00545-RNO    Doc 202    Filed 07/29/15    Entered 07/30/15 10:40:50    Desc
Main Document    Page 11 of 25

Factoring is "[t]he buying of accounts receivable at a discount. The price is discounted because the factor (who buys them) assumes the risk of delay in collection and loss on the accounts receivable." Black's Law Dictionary (10th ed. 2014). When the owner of receivables enters into a factoring agreement with a party, the transaction may be characterized as a true sale or as a financing agreement. To classify a transaction accurately, several attributes must be examined, primarily the allocation of risk. Most courts determine the nature of the transaction by considering a list of factors. Some of the most common factors are: 1) whether the buyer has a right of recourse against the seller; 2) whether the seller continues to service the accounts and commingles receipts with its operating funds; 3) whether there was an independent investigation by the buyer of the account debtor; 4) whether the seller has a right to excess collections; 5) whether the seller retains an option to repurchase accounts; 6) whether the buyer can unilaterally alter the pricing terms; 7) whether the seller has the absolute power to alter or compromise the terms of the underlying asset; and 8) the language of the agreement and the conduct of the parties. *See* Robert D. Aicher, William J. Fellerhoff, *Characterization of A Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 Am. Bankr. L.J. 181, 186-94 (1991) (collecting cases). Courts use some or all of these factors to determine whether a purported sale should be recharacterized as a loan. *Id.* Analysis of the various factors and their impact on the nature of the parties' agreement is fact-intensive, and a determination must be made based on the totality of the circumstances. The court must examine "the parties' practices, objectives, business activities and relationships and determine[] whether the transaction was a sale or a secured loan only after analysis of the evidence as to the true nature of

12

the transaction." *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 545 (3d Cir. 1979).[7]

### B. Factoring agreements under New York law

To constitute a bona fide factoring agreement under New York law,[8] the factor need only assume the risk that the seller's account debtor will be unable to pay. *Wechsler v. Hunt Health Sys., Ltd.*, 198 F. Supp. 2d 508, 519-20 (S.D.N.Y. 2002) (citing *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F. Supp. 693, 700 (S.D.N.Y.1996)) ("In a factoring arrangement, the factor only bears the loss if eventually a customer is unable to pay, hence, in effect, the factor acts as an insurer only of its client's customers' insolvency.") (internal quotation and citation omitted); *see Exportos Apparel Group, Ltd. v. Chemical Bank*, 593 F. Supp. 1253, 1256 (S.D.N.Y. 1984); *Garden State Yarn Corp. v. Rosenthal & Rosenthal*, 99 A.D.2d 721, 472 N.Y.S.2d 336, 337 (1984) ("the factor does not purport to conduct its customer's business for the

---

[7]The multiple factors tests devised by various courts to distinguish true sales from financing agreements has been criticized by commentators because of the uncertainty it creates in commercial markets. *See* Steven L. Harris, Charles W. Mooney, Jr., *When Is a Dog's Tail Not a Leg?: A Property-Based Methodology for Distinguishing Sales of Receivables From Security Interests That Secure an Obligation,* 82 U. Cin. L. Rev. 1029, 1040-43 (2014). The alternate approach advocated by Professors Harris and Mooney is based upon an analysis of the functional and economic attributes of property interests each party holds after the transaction and draws on the analogous process of distinguishing a true lease from a security interest. Applying this approach, a purported sale will be recharacterized as a secured transaction if the "seller" has retained a "meaningful interest in the receivables" and "the interest transferred to the purported buyer secures an obligation of the seller." *Id.* at 1077. This approach provides a coherent framework for analyzing the sale versus financing dichotomy that often has eluded courts struggling to apply varying sets of factors. But whether I apply factors developed through decisional law or adopt the Harris and Mooney approach, the outcome is the same. Here, the transaction is a true sale.

[8]The Amended Factoring Agreement at § 6.5 provides for the application of New York law. Both parties agree New York law applies.

customer; the factor merely assures the customer against loss by reason of financial inability of the buyer to pay; all other problems remain those of the factor's customer").

New York factoring law holds that all other risks associated with the sale of the accounts receivable remain with the client (e.g., commercial disputes, regardless of the merits thereof). *See State Bank of India v. Walter E. Heller & Co., Inc.*, 655 F. Supp. 326, 332 (S.D.N.Y. 1987) (observing that in factoring relationship, right to charge back because of commercial disputes is "absolute"); *Bonnie & Co. Fashions*, 945 F. Supp. at 700; *Danleigh Fabrics, Inc. v. Gaynor–Stafford Indus., Inc.*, 95 A.D.2d 719, 463 N.Y.S.2d 828, 830 (N.Y. App. Div. 1983), *aff'd*, 62 N.Y.2d 677, 476 N.Y.S.2d 287, 464 N.E.2d 985 (N.Y.1984)). Thus, Durham's rights under the parties' agreement includes the standard components of factoring agreements recognized under New York law.

### C. The Amended Factoring Agreement – a true sale?

The Amended Factoring Agreement, by its own terms, is described as a "purchase contract and security agreement." The purpose of the agreement is stated to be "a true nonrecourse sale of [Dryden's] accounts. Durham Ex. § 1. Numerous other provisions also specifically reference or suggest a sale. *See*, *e.g.*, §2.2 (defining "Acceptable Account" or "Purchased Account" as one "approved for purchase in whole or in part. . . ."); § 3.2 (referring to accounts "offered for sale to Durham. . . ." ); §4.2.1. (referencing accounts "purchased by Durham"); § 4.6 (defining the "purchase price"); §4.11, §6.4 (repurchase of disputed accounts). These labels, however, offer little of value in determining the true character of the agreement. *See* Aicher & Fellerhoff, *supra* at 194 n.63 ("Most courts, however, de-emphasize the language used in a document, and consider intent and actual conduct more relevant."); Harris & Mooney, *supra*

14

at 1042 n.59 ("[W]e think the parties' expressed intention concerning the legal characterization of the transaction is by and large irrelevant.").

Looking beyond labels and into the details of the transaction, however, the Court finds substantial evidence that the parties entered into a true sale agreement. One consideration is the manner in which receivables were handled. If receivables are commingled with the seller's general operating funds, a loan rather than a sale is suggested. Here, §4.12 of the Amended Factoring Agreement required Dryden to "hold in trust and safekeeping, as the property of Durham, and immediately turn over to Durham the identical check or other form of payment received by [Dryden], whenever any payment on any Purchase Account comes into [Dryden's] possession. . . ." This provision indicates the parties' intent that monies related to transferred accounts would be retained separately and not be commingled with Dryden's general operating accounts.

As described above, the process by which Durham would collect the accounts receivable is not specified in the Amended Factoring Agreement. Durham's and Dryden's witnesses differed on whether payment of the invoices was made by Felker or by Dryden. Because Durham's witness was not directly involved with the Dryden account, Dryden's witnesses are more credible on this issue. As explained by Dryden's witnesses, once a final determination was made as to a client's tax liability, a check would be issued and sent to Attorney Felker. Felker would then either send the check to Dryden, which would release funds to Durham, or send a check directly to Durham. If a refund was not obtained, but the client's tax liability was reduced, Dryden would bill the client for its fee, collect the fee, and then remit the funds to Durham. Because Felker is Dryden's agent, whether Felker or Dryden remitted the funds is not relevant to the Court's

15

resolution of this matter. The Amended Factoring Agreement specifies that the proceeds of the accounts were Durham's property. Insufficient evidence was provided that the processing of the accounts supports recharacterization of the transaction as a loan[9]

The ability of a buyer to demand that it receive payment directly from account debtors supports the finding that the transaction is a sale. Here, § 4.4 of the Amended Factoring Agreement gives Durham that right. "Durham may notify any Customer [i.e., account debtor] to make payments directly to Durham for any Account." Durham Ex. 3 §4.4. After payment of several invoices was delayed, Durham exercised this right and demanded payment directly from Dryden's account debtors. Had Durham exercised this right at the inception of the agreement it would have been abundantly clear that the transfer of the accounts was a sale. Durham may have preferred not to exercise this right initially to avoid disrupting the business relationship between Dryden and its clients, but in any event, it was entitled to exercise that right at any time under the terms of the Amended Factoring Agreement.

Courts have held that the most important single factor when determining whether a transaction is a true sale is the buyer's right to recourse against the seller. One of the core attributes of owning a receivable is the risk that it will not be paid. If the buyer "sells" the receivable, but retains the risk of non-payment, it is more likely that the transaction will be recharacterized as a loan. An agreement "without recourse" means that the purchaser/factor agreed to assume the full risk of collecting the money owed to the seller, whereas an agreement "with recourse" means that the seller retains the risk of collection." *Filler v. Hanvit Bank*, 339 F.

---

[9]As discussed in detail below, there is insufficient evidence that the parties engaged in a course of conduct sufficient to effectuate a modification of the terms of the Amended Factoring Agreement.

16

Supp. 2d 553, 556 (S.D.N.Y. 2004), *aff'd*, 156 F. App'x 413 (2d Cir. 2005). Generally, if there is a full right of recourse against the seller, this weighs in favor of the existence of a loan because there is no transfer of risk. Recourse can take many forms including an obligation to repurchase accounts, a guaranty of the collectibility of accounts, or a reserve which is released when the receivables are paid. *See* Aicher & Fellerhoff, *supra* at 186.

The Amended Factoring Agreement provided that Durham accepted the risk of "non-payment on Purchased Accounts, so long as the cause of non-payment is solely due to the occurrence of an account debtor's financial inability to pay, an "Insolvency Event." Durham Ex. 3 §4.10. As to this discrete event, Durham had no recourse against Dryden. The agreement does, however, specify some events which would afford Durham recourse for non-payment. For example, Dryden agreed to "accept back (repurchase) from Durham any Purchased Account subject to a dispute between Customer and Client of any kind whatsoever." *Id.* at § 4.11. This included Durham's right to require Dryden to repurchase disputed accounts, all Purchased Accounts if there was an event of default, and accounts unpaid after ninety days if an insolvency event had not previously occurred. *Id.* at §6.4.1. While the foregoing provisions limit Durham's risk and provide some forms of recourse, they are insufficient to support recharacterization of the transaction as a loan.

Even the existence of a right of full recourse is not dispositive. Thus, for example, "the presence of recourse in a sale agreement without more will not automatically convert a sale into a security interest." *Major's Furniture Mart, Inc.*, 602 F.2d at 544. "The question for the court then is whether the nature of the recourse, and the true nature of the transaction, are such that the legal rights and economic consequences of the agreement bear a greater similarity to a financing

17

transaction or to a sale." *Id*. Put somewhat differently, if a seller conveys its entire interest in a receivable, the transfer is a true sale, even if the seller has a recourse obligation. *See generally* Harris & Mooney, *supra* (proposing that the more critical factor is whether the seller retains a significant interest in the property, not whether the seller has a recourse obligation). Here, Dryden transferred the full economic interest in the Purchased Accounts to Durham. Further, Dryden did not have a full recourse obligation, although it is misleading to characterize the transaction as "nonrecourse" when the agreement included a hold back provision (the "Reserve" in ¶ 4.9) and Durham could require Dryden to repurchase accounts "on demand" as set forth in ¶ 6.4.

Some courts also have examined the allocation of responsibility for servicing transferred accounts. A loan rather than a sale is suggested when a seller retains servicing responsibility. Conflicting evidence on this issue was presented at the hearing. Under § 4.4 of the Amended Factoring Agreement, Durham had the right to notify Dryden's customers to make payment directly to Durham. Additionally, under § 4.17 Dryden granted Durham a power of attorney to exercise various rights concerning the servicing and resolution of any Purchased Account. Under §§ 2.4 and 4.7, Durham was to perform various services as a result of the purchase of accounts, including accounts receivable record keeping, recording of invoices and payments, and collection of accounts. In reality, however, the servicing of the Purchased Accounts varied from the provisions of the Amended Factoring Agreement. Dryden and Dryden's agent Felker continued to service the accounts after they were sold to Durham. And although Durham had the right to collect receivables directly from account debtors, it relied on Dryden to collect the accounts and remit them to Durham until it notified account debtors to make payment directly to Durham in

18

May 2014. Under New York law, however, a seller's retention of servicing in a factoring

agreement does not require that the agreement be recharacterized as a loan because it does not

alter the division of risk. *See Wechsler*, 198 F. Supp.2d at 519-20. Therefore, Dryden's continued

servicing of accounts does not support recharacterization of the transactions as a loan.

Consideration of other factors also weigh in favor of finding this to be a true sale.

Durham paid "a price equal to the net amount of [each] Acceptable Account," defined to mean

"the face amount thereof less discounts or allowances of any nature. . . ." Durham Ex. 3 § 4.6.

This is typical for a sale. In addition, Durham received a fee of 3.5% of the original face amount

of each purchase account, plus additional fees payable after thirty days from the sale of the

invoice. Durham Ex. 3 § 4.7. While this "fee" provision may be viewed as a substitute for

interest indicative of a loan-type transaction, it just as readily may be characterized as the

computation of the discount at which the accounts were purchased. Therefore, this provision is

insufficient on balance to characterize the agreement as a secured loan. Moreover, with the

exception of the reserve (which is common in factoring agreements), Durham did not have a

right to recover from Dryden any deficiencies from the accounts receivable, nor did Dryden have

the right to repurchase the accounts if it paid the face amount plus Durham's fees.

Accordingly, when the above factors are considered, most support a finding that the

Amended Factoring Agreement provided for a true sale.

D. *The course of conduct of the parties following the sale*.

Dryden has argued that the terms of the Amended Factoring Agreement were modified by

the course of conduct of the parties. Section 6.6 of the Amended Factoring Agreement provides

that it "may be modified only by a written instrument executed by the parties hereto." As a

19

general rule, under New York law, "a written agreement that expressly states it can be modified only in writing cannot be modified orally." *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990). "Under certain conditions . . . a written agreement which provides that it cannot be modified except by a writing, can be modified by a course of conduct or actual performance." *Seven–Up Bottling Co. (Bangkok) v. Pepsico, Inc.*, 686 F.Supp. 1015, 1022 (S.D.N.Y.1988). For example, "when one party has induced the other party to rely on an oral modification, the first party may be equitably estopped from invoking the requirement that any modification be in writing." *Citibank, N.A. v. Wynmark Trust*, No. 92 CIV. 2305 (RPP), 1993 WL 78069, at *8 (S.D.N.Y. Mar. 17, 1993). The conduct claimed to have been performed in reliance on the oral modification must unequivocally refer to the modification, not the original writing. *Id.* Here, there is no alleged oral modification, induced reliance, or partial performance expressly referring to such a modification that demands that the Amended Factoring Agreement be recharacterized as a loan.

Similarly, while the agreement lacks any provision for "swapping out" slow paying invoices for new ones with no additional payments being made to Dryden, which clearly was demanded by Durham, this practice is insufficient to support recharacterization of the agreement as a loan. When the collection of the Mountainview accounts was delayed through no fault of Dryden or the account debtor, Durham asked Dryden to supply new invoices for the Mountainview account. While the substitution of invoices is more suggestive of a loan than of a sale, the practice seems to have functioned as a hedge against the depletion of funds held in reserve and as an alternative to declaring a default under §5.1.1. Because Durham did not accept any risks other than those related to insolvency, it could require Dryden to buy back late accounts

unrelated to an insolvency event. Therefore, this course of conduct does not weigh in favor of recharacterizing the transaction as a loan.

    *E.*  In re Grand Union *is inapposite*

Dryden places great reliance on *In re Grand Union*, 219 F. 353 (2d Cir. 1914). The Court finds, however, that the transaction in *Grand Union* is readily distinguishable from the agreement between Dryden and Durham. As an initial matter, Dryden contends that the *Grand Union* court focused on the parties' course of dealing rather than on the terms of the parties' agreement. This is not entirely accurate. The Second Circuit was not looking to the parties' course of dealing outside the four corners of the agreement, but was closely scrutinizing the terms of the agreement to ascertain whether it described a true sale or a loan notwithstanding that the parties' agreement purported to constitute a sale. The Second Circuit stated that "[i]t may be conceded that the evidence to prove a transaction to be different from what it appears to be from the written papers . . . must be clear and convincing." 219 F. at 357. Thus, the parties' agreement is the primary focus and evidence contradicting the parties' agreement must be clear and convincing. Such evidence was readily found in *Grand Union*, but is lacking here.

An examination of the facts in *Grand Union* illustrates this point. In *Grand Union*, a lessor of pianos, entered into an agreement with Hamilton Investment Company ("Hamilton"), whereby Hamilton, purportedly, would purchase certain leases. The Second Circuit found that despite the parties' use of language suggesting a purchase and sale, numerous elements of the contract suggested a loan. For example, one of the provisions of the agreement provided that

Grand Union guaranteed the principal and interest of the contract.[10] This provision is contrary to

the concept of a true sale. Similarly, in the event of the "nonpayment at maturity of any of the

installments of principal or interest on any of said contract by reason of the insolvency of the

debtors [lessees] or for any reason, then [Hamilton] is hereby given the right and option without

notice to apply any moneys in its hands or that may thereafter come into its possession, belonging

to [Grand Union] in settlement and discharge of such installments so in default." 219 F. at 354.

Because Hamilton essentially assumed no risk, it had full recourse against Grand Union, which is

more akin to a loan than to a sale. Further, the provision that once leases were paid they were

returned to Grand Union supports recharacterization of the agreement as a loan. This is a

significant factor as it evidences that the leases were being held as collateral for repayment of the

monies advanced and that Grand Union retained a significant economic interest in the leases after

the transfer. Additionally, (1) Grand Union "made itself responsible for every conceivable loss;"

(2) Hamilton "never looked to the persons obligated by the leases for the money due;" and (3) if

a lessee failed or refused to retain the merchandise after delivery, title reverted and remained with

Hamilton, but only "until the amount due in any such contract is fully paid and discharged." 219

F. at 362. As the Second Circuit stated "[w]e have, then, money advanced to be repaid in

installments; the time for payment being determined by the periods fixed in the respective leases

for the payment of moneys due on such leases, the contract also providing for the payment of

interest, and payment actually made by the Grand Union Company out of its general funds." *Id.*

These attributes are, of course, quintessential indicia of a loan.

---

[10]The Second Circuit stated that his factor was not dispositive, but is a relevant
consideration. 219 F. at 361.

22

In contrast, here, as previously discussed, Durham retained the credit risk, the accounts were not returned to Dryden upon full payment to Durham, Durham provided notice that it was directly collecting monies, Durham had the right to service the accounts, and Durham looked to Dryden's clients for payment (although not until later in the process when there was concern over the timely receipt of payments).

The foregoing analysis is not to say that the parties' agreement clearly and unequivocally demonstrates that it was intended as a true sale. There are some terms and conduct by the parties suggestive of a loan. However, for the reasons stated, the Court finds that, on balance, the Amended Factoring Agreement is more properly characterized as a true sale. Accordingly, the accounts Durham purchased pre-petition are not part of the bankruptcy estate.

### F. Interests of non-debtor parties not subject to a bankruptcy court's jurisdiction

The Court's conclusion that the Amended Factoring Agreement constituted a true sale of Dryden's accounts does not mean that any such sales were free of any liens held by Citibank or Beneficial. While it appears that all accounts were subject to Citibank's liens and all but the Fiserv invoices are subject to Beneficial's liens, that determination is beyond this Court's jurisdiction.

Section 1334(b) of title 28 provides a bankruptcy court may, by reference from the district court, hear cases "arising under title 11, or arising in or *related to* cases under title 11." 28 U.S.C. § 1334(b) (emphasis added). "Related to" cases may only be heard if the "outcome of [the] proceeding could *conceivably* have any effect on the estate being administered. *Pacor, Inc. v. Higgins,* 743 F.2d 984, 994 (3d Cir.1984), *overruled in part by Things Remembered, Inc. v. Petrarca,* 516 U.S. 124, 124–25(1995). An action thus generally is "related to" a bankruptcy

proceeding "if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *Pacor,* 743 F.2d at 994 *quoted in Nuveen Mun. Trust ex rel. Nuveen High Yield Mun. Bond Fund v. WithumSmith Brown, P.C.*, 692 F.3d 283, 293-95 (3d Cir. 2012). Courts frequently have held that disputes among creditors about the priorities of their claims against a debtor are not within a bankruptcy court's jurisdiction. *Saul, Ewing, Remick & Saul v. Provident Savings Bank*, 190 B.R. 771, 775 (D. Del. 1996). And more directly, the Third Circuit has held that property that is sold before the creation of the bankruptcy estate "no longer belongs to the estate, and a dispute arising out of such property cannot invoke the 'related to' jurisdiction of a district court." *Id.* at 776. Accordingly, because the disputed accounts were sold to Durham well before the bankruptcy petition was filed, they are not property of the estate under 11 U.S.C. § 541(a) and disputes about the relative interests of Beneficial, Citibank, and Durham in the accounts are beyond this Court's jurisdiction.

## III. CONCLUSION

For the reasons set forth above, the Amended Factoring Agreement is determined to be a true sale of accounts and, therefore, the accounts receivable transferred by Dryden to Durham more than ninety days before the filing of the bankruptcy petition are not assets of Dryden's bankruptcy estate. Further, having determined that the accounts are not property of the estate, the Court lacks jurisdiction to determine the relative interests of Beneficial, Citibank, and Durham in the transferred accounts.

An Order consistent with this Opinion will be entered.

**By the Court,**

Chief Bankruptcy Judge

Date: July 29, 2015